SCIRICA, Chief Judge,
dissenting in part, concurring in part.
Although I concur in some parts of the Court’s comprehensive analysis of this complex agency order, including its rejection of the constitutional challenges, I respectfully dissent from its decision to vacate and remand. In my view, the Court’s decision has upended the usual way the judiciary reviews agency rulemaking. Whether the standard is “arbitrary or capricious,” “reasonableness,” or some variant of a “deregulatory presumption,” the Court has applied a threshold that supplants the well-known principles of deference accorded to agency decision-making. In so doing, the Court has substituted its own policy judgment for that of the Federal Communications Commission and upset the ongoing review of broadcast media regulation mandated by Congress in the Telecommunications Act of 1996.
I would lift the stay and allow the Commission’s media ownership rules to go into effect. It is not the role of the judiciary to second-guess the reasoned policy judgments of an administrative agency acting within the scope of its delegated authority. Allowing the biennial (now quadrennial) review process to run its course will give the Commission and Congress the opportunity to monitor and evaluate the effect of the proposed rules on the media marketplace. More importantly, it will ensure that accountability for these crucial policy decisions rests with the political branches of our government.
I. Introduction
In 1934, Congress delegated broad authority to the Federal Communication Commission to regulate “interstate and foreign commerce in communication by wire and radio,” and to grant station broadcast licenses that served “public convenience, interest, and necessity.” Communications Act of 1934, 47 U.S.C. §§ 151, 309(a). This statutory authority to regulate broadcast media is girded by an obligation “to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.” Red Lion Broad. Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The FCC’s delegated responsibility to foster a robust forum for national debate is unique in administrative law and essential to the vibrancy of our deliberative democracy. See Buckley v. Valeo, *436 424 U.S. 1, 49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (“Democracy depends on a well-informed electorate.”).
Preserving the “marketplace of ideas” does not easily lend itself to mathematical certitude. While other independent federal agencies may act with greater measurable precision in reducing pollution emissions, defining safety standards or even establishing interest rates, the FCC operates in the less scientific arena of speech and debate.[83] In this realm, the Commission’s mandate to maintain viewpoint diversity in the national broadcast media is complicated both by the “elusive” concept of diversity,[84] and by the inherent uncertainty regarding the prospective effects of structural rules.[85] Even the direct regulation of specific broadcast content — e.g., content guidelines for news and public affairs programming — does not necessarily assure viewpoint diversity will be achieved.
The Commission’s duty to regulate broadcast media in the public interest is further complicated by the unpredictable impact of emerging technologies on the media marketplace. When the Commission was first formed, AM or “standard” radio was the only broadcast medium of practical concern. See 2002 Biennial Regulatory Review - Review of the Commission’s Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, 18 F.C.C.R. 13,620, 13,649-651 ¶¶ 90-94, 2003 WL 21511828 (2003) (“Order”) (detailing history of the modern media marketplace). Today, the modern media marketplace includes literally thousands of radio and broadcast television stations, hundreds of national, regional and local non-broadcast television networks delivering a vast range of content over cable and direct broadcast satellite systems, and perhaps most significantly, the Internet and a host of digital technology-enabled interactive services. Id. ¶¶ 95-128. In designing media ownership rules for this dynamic technological landscape, the Commission must balance the potentially negative effects of license ownership concentration on programming diversity against the economic viability of new or struggling media outlets.
Over the past seventy years, the Commission has actively adjusted its license ownership rules on an ongoing basis to foster the growth of new media outlets while maintaining a focus on programming diversity. For much of its early history, the Commission operated with the assumption that diversification of ownership best served the public interest in promoting programming diversity.[86] For example, in 1938 the Commission denied Genesee Radio Corporation’s application for a second AM station license after concluding it was “not in the , public interest to grant the facilities for an additional broadcast station to interests already in control of the operation of a station of the same class and in *437 the same community.” Genesee Radio Corp., 5 F.C.C. 183, 186 (1938). For the next forty years, media regulation continued primarily “on the theory that diversification of mass media ownership serves the public interest by promoting diversity of program and service viewpoints, as well as by preventing undue concentration of economic power.”[87] NCCB, 436 U.S. at 780, 98 S.Ct. 2096.
The Commission has departed from this baseline presumption when strict adherence to a policy of ownership diversity threatened to drive some media outlets from the market. For example, in the early 1970s, the Commission relaxed its “one-to-a-market” rule to permit co-ownership of AM and FM licenses in the same market after observing that most AM-FM combinations were “economically and/or technically interdependent,” and that most free-standing FM stations were not economically viable without a co-owned AM license revenue. See Amendment of Sections 73.35, 73.240 and 73.636 of the Commission’s Rules Relating to Multiple Ownership Rules of Standard, FM and Television Broadcast Stations, 28 F.C.C.2d 662, 671 ¶ 33, 1971 WL 23029 (1971). The Commission similarly permitted UHF-radio combinations on a case-by-case basis to encourage the development of the UHF broadcasting medium. Id. at 674. Likewise, in repealing national ownership caps for television and radio, the FCC concluded the potential economic efficiency gains from “group ownership actually further[ ], rather than frustrate[ ], the foremost First Amendment goal of augmenting popular discussion of important public issues.” Amendment of Section 73.3555 of the Commission’s Rules Relating to Multiple Ownership of AM, FM, and Television Broadcast Stations, 100 F.C.C.2d 17, 20, 1984 WL 251222 (1984).
The dynamic evolution of the media ownership rules — with the Commission intermittently encouraging and discouraging economic concentration- — demonstrates the virtual impossibility of drafting a single, static regulatory structure that consistently serves the public interest for an extended time period. The Commission’s statutory mandate to regulate broadcast media “in the public convenience, interest, and necessity” has been interpreted to require this sort of iterative, if imprecise, rulemak-ing. Nat’l Broad. Co. v. United States, 319 U.S. 190, 225, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (“If time and changing circumstances reveal that the ‘public interest’ is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations.”).
The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, codified this ongoing review process by requiring the Commission to conduct a biennial review of its media ownership rules and “repeal or modify” any rule that no longer serves the, public interest. Id. at § 202(h), *438 110 Stat. at 111-112.[88] On the cusp of an unprecedented revolution in communication technologies, Congress set in motion this statutorily-prescribed process of media deregulation based on the conviction that increased competition in the media marketplace would best serve the public interest.[89] The significance of the mandatory review mechanism should not be ignored. This particular set of ownership rules — like any of those passed by the Commission — is not cast in iron. No single set of proposed rules can perfectly capture the dynamic nature of the media marketplace. These rules serve as an important point of reference in a'n ongoing review process. Nevertheless, the latest rules represent a reasoned step towards the pro-competitive, deregulatory media ownership framework contemplated by Congress.[90]
Short-circuiting the statutory review process deprives both the Commission and Congress the valuable opportunity to evaluate the new rules and the effects of deregulation on the media marketplace. Under the original implementation schedule, the Commission already would have initiated its assessment of the proposed rules in preparation for the 2004 Biennial Review. See Telecommunications Act of 1996 § 202(h). Vacating and remanding the proposed rules to the Commission will preserve the. existing rules in place for months or even years,[91] and the resulting delay will likely leave the public worse off than if these rules were allowed to take effect.[92]
*439 Given the dynamic nature of the industry, the task of crafting a regulatory structure that reflects the realities of the media marketplace requires the Commission to make predictive judgments about the future. Courts have consistently recognized the Commission’s authority and unique expertise in making such estimations. See Cellco P’ship v. FCC, 357 F.3d 88, 98 (D.C.Cir.2004) (“Nothing ... suggestfs] that under § ll’s biennial review mandate the Commission could no longer rely on its predictive judgment or properly-supported inferences in determining to retain a regulation.”). Courts also have correctly acknowledged it is virtually impossible for an agency to compile an unchallengeable factual record in support of forward-looking rules designed to anticipate the future development of the marketplace. As the Supreme Court noted, “[i]n such circumstances complete factual support in the record for the Commission’s judgment or prediction is not possible or required; ‘a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.’ ” NCCB, 436 U.S. at 814, 98 S.Ct. 2096 (quoting FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 29, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961)).
Foremost among the future developments facing the Commission is the explosive growth of the Internet as a media source. The unique qualities of the Internet provide an unimaginable breadth of accessible information as well as a forum for individual expression. The Supreme Court recognized the unique nature of this media source when it wrote:
The Internet ... offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.” 47 U.S.C. § 230(a)(3) (1994 ed., Supp. V). While “surfing” the World Wide Web, the primary method of remote information retrieval on the Internet today, individuals can access material about topics ranging from aardvarks to Zoroastrianism. One can use the Web to read thousands of newspapers published around the globe, purchase tickets for a matinee at the neighborhood movie theater, or follow the progress of any Major League Baseball team on a pitch-by-pitch basis.
Ashcroft v. ACLU, 535 U.S. 564, 566, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (citations omitted).
By requiring the Commission to craft a set of media ownership rules that perfectly account for the effects of concentration, economic efficiency, diversity and future technological progress, the majority constructs a high bar and impedes the review process established by Congress. Instead of asking the Commission to start from zero, the prudent step would be to allow these reasoned rules to go into effect, monitor the resulting impact on the media marketplace, and allow the Commission to refine or modify its approach in its next quadrennial review. In the interim, if the Commission goes too far or ignores the scope of its statutory mandate, Congress itself may act, as it already has with respect to the national television ownership rules, see Consolidated Appropriations Act of 2004, 118 Stat. 3, to modify or repeal any rule it deems to be no longer in the public interest.
There are, of course, alternative approaches the Commission might have taken in crafting the proposed media owner *440 ship rules. But the Commission acted within its delegated authority by adopting a set of rules which it properly determined would serve the public interest. Our review of those rules is necessarily cabined within our traditional constitutional role. The courts “must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.” Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Whether or not we agree with this particular set of rules, it is not our role to overturn the Commission’s reasoned policy judgments. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (“The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: ‘Our Constitution vests such responsibilities in the political branches.’ ”) (quoting TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). Questions of media diversity and ownership command strongly divergent views. But those questions should be answered by officials within our legislative and executive branches of government.
II. Standard of Review
This is an appeal of an agency decision under the Communications Act of 1934, 47 U.S.C. § 151 et seq. This Court’s jurisdiction is based on 47 U.S.C. § 402(a), and 28 U.S.C. § 2342(1). Although there are some similarities, I differ from the majority on the applicable standard of review. Moreover, I believe the majority’s subsequent analysis oversteps the appropriate standard. In doing so, the majority substitutes its own judgment for policy decisions meant to be resolved by the Agency.
A.
As noted, Petitioners bring a litany of challenges to the Commission’s Order. Different standards of review apply to the various challenges. In reviewing a contention that an agency rule is arbitrary and capricious, our standard of review is governed first by the Administrative Procedure Act, 5 U.S.C. § 706. Under the APA, this Court is instructed to “hold unlawful and set aside agency action, findings, and conclusions” that are found to be “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” § 706(2)(A); New Jersey Coal. for Fair Broad. v. FCC, 574 F.2d 1119, 1125 (3d Cir.1978).
The scope of review under the “arbitrary and capricious” standard is “narrow, and a court is not to substitute its judgment for that of the agency.” Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Nevertheless, in reaching its decision, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a “rational connection between the facts found and the choice made.” Id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Normally, an agency rule is arbitrary and capricious where:
the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency’s action that the agency itself has not given.
*441 Id.; see also Robert Wood Johnson Univ. Hosp. v. Thompson, 297 F.3d 273, 280 (3d Cir.2002). We will, however, “uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.” Motor Vehicle Mfrs. Ass’n, 463 U.S. at 43, 103 S.Ct. 2856 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).
The scope of our review is necessarily influenced by the authority allocated to the FCC in its enabling act. The 1934 Act grants “broad discretion” to the Commission to allocate broadcast licenses in the “public interest, convenience and necessity.” FCC v. WNCN Listeners’ Guild, 450 U.S. 582, 594, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981). The Act’s public interest standard is a “supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy.” Id. at 593, 101 S.Ct. 1266 (quoting FCC v. Pottsville Broad. Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940)). The Commission’s broad authority suggests that “the Commission’s judgment regarding how the public interest is best served is entitled to substantial judicial deference,” and “is not to be set aside” as long as its implementation of the public interest standard is “based on a rational weighing of competing policies.” Id. at 596, 101 S.Ct. 1266.
Finally, the standard of review is even more deferential “where the issues involve ‘elusive’ and ‘not easily defined’ areas such as programming diversity in broadcasting.” Sinclair Broad. Group v. FCC, 284 F.3d 148, 159 (D.C.Cir.2002). Because many aspects of this administrative order involve policy determinations on such elusive goals, a “rationality” standard is often appropriate. See NCCB, 436 U.S. at 796-97, 98 S.Ct. 2096 (finding the Commission acted rationally in determining diversification of ownership would enhance the likelihood of achieving diversity of viewpoints). Additionally, where issues involve line-drawing determinations, our review is necessarily deferential to agency expertise, see AT&T Corp. v. FCC, 220 F.3d 607, 627 (D.C.Cir.2000), so long as these decisions do not run counter to the evidence before the agency. Sinclair, 284 F.3d at 162.
B.
Several Deregulatory Petitioners challenge the Order as violating § 202(h) of the 1996 Act. This section reads:
The Commission shall review its rules adopted pursuant to this section and all of its ownership rules biennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.
Because the Order was promulgated as part of the biénnial review required by this section, our review is necessarily informed by Congress’ direction in the statute that in addition to reviewing its ownership rules biennially to “determine whether any of such rules are necessary in the public interest as the result" of competition[,] [t]he Commission shall repeal or modify any regulation it determines to be no longer in the public interest.” § 202(h).
This statutory language has been interpreted to correspond with the deregula-tory process codified in the 1996 Act. See Fox I, 280 F.3d at 1033 (noting that in § 202(h) Congress instructed the Commission to “continue the process of deregulation”); Sinclair, 284 F.3d at 159 (“This sentence appears as the last sentence of Congress’s instruction that the review of each of its ownership rules every two *442 years ‘which the court characterized as designed to continue the process of deregulation.’ ”) (quoting Fox I, 280 F.3d at 1033).
The FCC recognized its heightened burden for maintaining regulations in its Order, noting that “Section 202(h) appears to upend the traditional administrative law principle requiring an affirmative justification for the modification or elimination of a rule.”[93] Order ¶ 11. The FCC further recognized the direction from Fox and Sinclair that “Section 202 carries with it a presumption in favor of repealing or modifying the ownership rules.” Order ¶ 11; Fox, 280 F.3d at 1048; Sinclair, 284 F.3d at 159.[94] The FCC must demonstrate that retention of the rules remains in the public interest. See Fox, 280 F.3d at 1044 (faulting the Commission for providing no analysis of the state of the television broadcast market in maintaining the National Television Ownership Rule). As noted at the outset, this requirement does not preclude the FCC from relying on predictive judgments and expertise in crafting its rules. See id. at 1051 (noting that the “court should ordinarily defer to the Commission’s predictive judgments”). The Commission’s authority to rely on predictive judgments and empirical assumptions was recently affirmed by the Court of Appeals for the D.C. Circuit. See Am. Family Ass’n, Inc. v. FCC, 365 F.3d 1156, 1166 (D.C.Cir.2004) (noting “necessarily wide latitude to make policy based on predictive judgments deriving from [the Commission’s] general expertise”).
At issue on the § 202(h) standard of review is whether and to what extent the presumption to repeal or modify ownership rules turns on the definition of the term “necessary.” The FCC interpreted “necessary” in § 202(h) to mean “useful,” “convenient” or “appropriate” rather than “required” or “indispensable.” 18 F.C.C.R. 4726, 4730-36 (March 14, 2003); Order ¶ 11 n. 15 (citing same). The FCC’s inter *443 pretation of “necessary” is correct.[95] The term “necessary” in statutes has been found repeatedly to mean “useful” or “appropriate” rather than “indispensable.” 18 F.C.C.R. at 4731 n. 24 (citing, inter alia, Morgan v. Commonwealth of Va., 328 U.S. 373, 377-78, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946)); see also Cellco, 357 F.3d at 99.
The FCC’s interpretation of “necessary” does not neutralize the deregulatory flavor of the 1996 Act. Under the FCC’s interpretation, a regulation must be useful (albeit not indispensable) in promoting the public interest in order to survive the biennial— now quadrennial — review process. The “presumption,” therefore, is that a regulation will be vacated or modified if it does not continue to be in the public interest. This is different from the traditional approach to rule retention, which would counsel for retention of a rule unless there were reasons to change it. In this sense, Congress’ mandate and the FCC’s approach is “deregulatory” because it would repeal or modify rules no longer found to be in the public interest.
The FCC looked to the structure of the 1996 Act in reaching its interpretation. The FCC recognized that “necessary” appears in other sections of the Communications Act that discuss the FCC’s rule-making powers, and in those contexts “necessary” has taken on the “useful” meaning. See, e.g., 47 U.S.C. § 201(b). Holding the review process to a more stringent standard would lead to the absurd result of the FCC issuing a rule as merely useful, but then having to revoke it at the next review because it is not indispensable. Furthermore, if the rule-making and review definitions of “necessary” were different, the FCC could simply sidestep the more stringent review standard by repealing and then reissuing any useful rules that were not indispensable.
The rulemaking provisions are permissive, while the biennial review is mandatory. Compare, e.g., id. (Commission “may prescribe such rules and regulations as may be necessary in the public interest”) with § 202(h) (“The Commission shall review its rules ... biennially ... and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.”) (emphasis added). That the FCC is permitted to make rules but required to review them, however, does not shed light on the meaning of the term “necessary.” The mandatory nature of the review is not undermined by the “useful” interpretation. The FCC must repeal or modify a rule that is no longer useful in promoting the public interest.
Recently in Cellco, 357 F.3d 88, the D.C. Circuit upheld the Agency’s interpretation of “necessary” in a similar review provision of the 1996 Act.[96] The FCC’s “useful” interpretation of the statutory language is a *444 reasonable one, and should be upheld.[97]
The 1996 Act’s legislative history bolsters the FCC’s interpretation. Section 202(h) falls within the ambit of a larger review provision, Section 11 in the 1996 Act. The conference report regarding Section 11, H.R. Conf. Rep. No. 104-458, at 185 (1996), interprets “no longer in the public interest” as “no longer meaningful.” This phrase, of course, is essentially synonymous with the phrase “no longer useful” or “no longer appropriate,” and much less exacting than “no longer indispensable.” Thus, the Conference Report’s definition of “no longer in the public interest” supports the FCC’s interpretation of “necessary.”
Despite § 202(h)’s admittedly deregula-tory tenor, the statute does not foreclose the possibility of increased regulation under the biennial review if the Commission finds such action in the public interest. Nothing in the 1996 Act overcomes the broad rulemaking authority of the FCC. See 47 U.S.C. § 303(r). Any limitation must be clearly stated by Congress. See, e.g., Am. Hosp. Ass’n v. NLRB, 499 U.S. 606, 613, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991) (stating that “if Congress had intended to curtail in a particular area the broad rulemaking authority [it has] granted ... we would have suspected it to do so in language expressly describing an exception [to the authority]”).[98]
Finally, though the Order must be consistent with the remand directives from Fox and Sinclair, and those reasoned decisions are instructive, they are not the law of the case in the current appeal. This case involves petitions for review of the FCC’s comprehensive reexamination of a larger set of its broadcast ownership rules, in which a different set of parties participated, a different record was compiled, and a different result reached. See, e.g., Hamilton v. Leavy, 322 F.3d 776, 786 (3d Cir.2003) (Law of the case doctrine applies only to the “same litigation.”).[99]
But Sinclair is instructive for another reason relating to the proper application of our standard of review. In Sinclair, the D.C. Circuit found the Commission failed to demonstrate its exclusion of non-broadcast media from its definition of “voices” in its local television ownership rule was not arbitrary and capricious. 284 F.3d at 165. The Commission’s failure in the order at issue in Sinclair is notably different in both kind and degree from the purported *445 “flaws” the majority believes require vacating the FCC’s Order here.
In sum, the standard of review is governed foremost by the APA’s requirement that the FCC’s rules not be arbitrary and capricious. Beyond this, we bear in mind the requisite flexibility afforded the Commission’s rulemaking under the 1934 Act, and the particular deference granted to the Commission’s decisions on diversity and other difficult to define goals. Finally, § 202(h) overlays a deregulatory tenor on our review. While I would not term this standard a “deregulatory presumption,” the FCC is required to demonstrate that its rules remain useful in the public interest.
III. Rules at Issue in this Appeal and Agency Rationale for Rules
The majority partially vacates and remands the Order for the Commission to re-evaluate certain purported flaws. With regard to the Diversity Index, the majority finds the weight assigned to the Internet, as well as the assumption of equal shares for outlets within the same media type lacks record support. The majority also finds the Commission inconsistently derived its Cross Media Limits from the Diversity Index results. In regard to the local ownership rules, the majority finds the television and radio rules’ reference to a particular market structure' — one with equal-sized firms — as the Commission’s underpinning for adopting specific ownership limits, is not supported by the record. In my view, none of these purported flaws reach the level of arbitrary and capricious decision-making or violate § 202(h).[100]
The majority’s conclusions cannot be evaluated without examining the underlying rules and the FCC’s rationale for the changes. The evolution of the challenged rules puts the Agency’s mammoth task in perspective. This includes discussion of the FCC’s goals and objectives in its biennial review. In my view, the Agency rationale supports the rule changes and demonstrates that the Commission’s decisions were neither arbitrary nor capricious.
A. Policy Goals and Media Landscape
In accordance with its 2002 biennial review obligations, the Commission initiated a comprehensive review of six media ownership rules. Order ¶ 1. As part of its 2002 Biennial Review, the Agency sought comment on four broadcast ownership rules: the Local Television Multiple Ownership Rule on remand from Sinclair; the Radio-Television Cross-Ownership Rule; the National Television Multiple Ownership Rule on remand from Fox;[101] and the Dual Network Rule. 2002 Biennial Regulatory Review, 17 F.C.C.R. 18,503, 2002 WL 31108252 (2002). The FCC also incorporated pending proceedings on local radio ownership, Rules and Policies Concerning Multiple Ownership of Radio Broadcast Stations in Local Markets; Definition of Radio Markets, 16 F.C.C.R. 19,861 2001 *446 WL 1402453 (2001), Definition of Radio Markets, 15 F.C.C.R. 25,077 (2000), and proceedings on newspaper/broadcast cross-ownership. Cross-Ownership of Broadcast Stations and Newspapers, 16 F.C.C.R. 17,283, 2001 WL 1097041 (2001).
The Order at issue here commenced with a notice of proposed rulemaking released in September 2002. 17 F.C.C.R. 18,503, 2002 WL 31108252 (2002) (“NPRM”). To help guide its analysis, the Commission established a Media Ownership Working Group (“MOWG”), which commissioned twelve studies ranging from consumer surveys to economic analyses of media markets. Interested parties filed thousands of pages of comments, consisting of legal, social, and economic analyses, empirical and anecdotal evidence, and industry and consumer data to support their positions.
The result was a 256-page order in which the Commission analyzed the record and determined, by a three-to-two vote, to modify its ownership rules to provide a “new, comprehensive framework for broadcast ownership regulation.” Order ¶ 3. The FCC adopted the Order on June 2, 2003, and released it a month later, on July 2, 2003. A summary of the Order was published in the Federal Register on August 5, 2003. 68 Fed. Reg. 46,286 (Aug. 5, 2003).
1. Policy Goals of the Present Order
In its Order, the Commission identified three longstanding policy goals that would continue to guide its ownership rules: diversity, competition, and localism. The Commission found five types of diversity relevant to ownership policy: viewpoint diversity, program diversity, outlet diversity, source diversity, and minority and female ownership diversity. Order ¶ 18.
Viewpoint diversity applies to the availability of media content reflecting a variety of perspectives. Id. ¶ 19. This goal endeavors to ensure a robust marketplace of ideas. The Commission adhered to its “longstanding determination that the policy of limiting common ownership of multiple media outlets is the most reliable means of promoting viewpoint diversity.” Id. ¶ 26.
Programming diversity refers to a variety of programming formats and content. Id. ¶ 36. The Commission found that programming diversity was generally best achieved by reliance on competition between delivery systems. Id. ¶ 37. According to the Commission, outlet diversity means that in a given market there are multiple independently owned firms. Id. ¶ 38. The Commission found that regulating the ownership of outlets to achieve outlet diversity was preferable to attempting to engineer outcomes directly, because ownership regulation reduces the need for the Commission to make subjective judgments about program content. Id. ¶ 39.
Source diversity refers to the availability of media content from a variety of content producers. Id. ¶ 42. In light of dramatic changes in television markets, including the increase in the number of channels available to most households, the Commission determined that source diversity need not be an objective of its broadcast ownership policies. Id. ¶ 43. Minority and female diversity refers to policies which encourage minority and female ownership of media sources, and the Commission reaffirmed this policy goal in the Order. Id. ¶ 46.
As set forth in the preamble to the 1996 Act, Congress believed greater competition and reduced regulation would inure to the public benefit. 1996 Act, preamble, 110 Stat. 56. The Order reaffirmed the Commission’s “longstanding commitment to promoting competition by ensuring pro- *447 competitive market structures,” Order ¶ 57, recognizing “ [consumers receive more choice, lower prices, and more innovative services in competitive markets than they do in markets where one or more firms exercises market power.” Id. In satisfying its competition goal, the Commission also noted competitive markets help contribute to the related goal of viewpoint diversity. Id. ¶58. The Commission pointed out that competition also furthers the goal of product innovation. Id. ¶ 69.
Federal regulation of broadcasting historically has placed significant emphasis on localism. The policy goal of localism addresses whether broadcast stations are responsive to the needs and interests of their local communities. Id. ¶ 74. Localism is contained in congressional directives to the Commission and has been judicially reaffirmed as a valid regulatory objective. Id. ¶ 73; see NBC v. United States, 319 U.S. 190, 203, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (“Local program service is a vital part of community life. A station should be ready, able, and willing to serve the needs of the local community....”). The Commission sought to promote localism through market structures that take advantage of media companies’ incentives to serve local communities. To measure lo-calism, the Commission focused on the selection of programming responsive to local needs and interests, and local news quantity and quality. Order ¶ 78-79.
The Commission considered the regulatory framework that would best achieve its goals. It recognized that bright line rules and case-by-case analysis offer different advantages. The Commission concluded that bright line rules provide greater “certainty to outcomes, conserve resources, reduce administrative delays, lower transaction costs, increase transparency of [the] process, and ensure consistency in decisions.” Id. ¶ 82. The Commission determined that a case-by-case process accounts for the particular circumstances of each transaction but is fraught with regulatory problems, id. ¶ 84, such as high administrative costs and a lack of planning and investment predictability for media owners.[102] Based on the efficiencies and predictability of bright line rules, this regulatory model supports most of the Agency’s rules. Id. ¶ 85. The Agency reiterated the bright line rules were adopted based on a comprehensive review of the media marketplace and its assessment of what rules were necessary to promote its goals.
2. New Media Landscape and the Growth of the Internet
In its Order, the Commission took substantial notice of the expanding media market and significant technological advances that influence its rules. The Commission commented: “This Order confronts that challenge by determining the appropriate regulatory framework ... in a world characterized not by information scarcity, but by media abundance.” Id. ¶ 89.
Significant technological advances in the media marketplace over the last twenty-five years required new regulatory responses from the Commission. Among these advances in the distribution of information were the Internet, satellite distribution systems, cable television and videocassette recorders. Today there are over 308 satellite delivered non-broadcast networks available for carriage over cable, direct broadcast satellite systems (“DBS”), and other multi-channel viewed programming distribution (“MVPD”) systems. *448 Within more traditional sources, the number of broadcast television and radio outlets have also grown significantly in the last 40 years. Id. ¶ 121.
This explosion of new media sources is best illustrated by the Internet. The Commission commented:
The Internet, as an entirely new medium, composed of an amalgam of all the technologies that preceded it, completely transformed the way in which we communicate in unimaginable ways. These advances not only enabled the provision of vast amounts of content they also put more control in the hands of the public, allowing them to control what, when and how they receive information.
Order ¶ 111. The Internet provides a forum for unlimited numbers of independently administered voices. Additionally, content on the Internet is multimedia; it can be read, heard, and viewed simultaneously. Id. ¶ 118. The Commission also pointed out that experiencing web content is a highly individualized activity where people can access the Internet 24 hours a day anywhere they have access to a web browser. Id.
The Internet has spawned a new way of looking at media. The first graphical interface for the Internet was introduced in 1989. In 1992 there were only 50 websites in the world. By 1994, there were as many as 3,000 web sites in use. By year-end 2000, there were more than 30 million web sites. Id. ¶ 117. Approximately 42.5 million American households subscribed to an Internet access provider in 2000. Id. ¶ 120. According to submitted comments, 62.6 million households in 2001 were online, and that total is expected to rise to 86.3 million, or 76% of total U.S. households by 2006. Comments of Tribune Co., at 10.
According to the Commission, virtually every major media company has a corresponding web site, and any person with access to a web-hosting file server can create a web site, which the public may access. Internet users can view sites of their own choosing or can use a search engine, such as Google News, which presents information gathered from approximately 4,500 news sources worldwide.[103] Id. ¶ 119. In conclusion, the Commission determined that:
there are far more types of media available today, far more outlets per-type of media today, and far more news and public interest programming options available to the public today than ever before. Although many of these new outlets are subscriptiombased ... the competitive pressure placed upon free, over-the-air media has led to better quality and in some cases, an increase in the quantity of some types of content. In the next five to ten years, we expect more free, over-the-air content to become available as new technologies (i.e., digital transmission) are applied to these traditional media (i.e., broadcast television).
Id. ¶ 128. This dynamic, rapidly changing media landscape provided the backdrop for the Commission’s ownership rules.
B. Ownership Rules
1. Cross-Ownership Rules
a. History of Cross-Ownership Regulation
For many years the Commission maintained rules governing cross-ownership of *449 media in local markets. From 1975 through the present Order, the Newspaper/Broadcast Cross-Ownership Rule prohibited a single company from owning a full-service radio or television broadcast station and a daily newspaper serving the same community. See 47 C.F.R. § 73.3555(d) (2002). The rule was intended to promote media competition and diversity. 50 F.C.C.2d at 1074. The Commission examined the newspaper/broadcast cross-ownership prohibition in 1998 and concluded that the rule continued to serve the public interest because it furthered diversity. 15 F.C.C.R. at 11,105-08 ¶¶ 89-93. In that review, the Commission noted the rule should be continually reviewed to ensure it remained in the public interest. Specifically, the Commission noted “[tjhere may be instances, for example, in which, given the size of the market and the size and type of the newspaper and broadcast outlet involved, sufficient diversity and competition would remain if a newspaper/broadcast combination were allowed.” Id. at 11,109 ¶ 95.
In 1970 the Commission issued a “one-to-a-market” Radio/Television Cross-Ownership Rule, which proscribed common ownership of more than one full-time broadcast station (radio or television) in the same market. Amendment of Sections 73.35, 73.240, and 73.636 of the Commission Rules Relating to Multiple Ownership of Standard, FM and Television Broadcast Stations, 22 F.C.C.2d 306, 307-OS ¶¶ 5-8, 1970 WL 18044 (1970). Like the newspaper/broadcast rule, the purpose of the rule was twofold: (1) to promote competition in broadcasting; and (2) to promote diversification of programming sources and viewpoints. Id. at 307 ¶ 3. In 1989, the Commission relaxed its “one-to-a-market” rule by implementing a lenient waiver policy for applications involving radio and television combinations in the top 25 markets. Second Ownership Order, 4 F.C.C.R. 1741 ¶ 1, 1989 WL 510875 (1989). The 1996 Act required the Commission to extend the radio-television cross-ownership presumptive waiver policy to the top 50 television markets “consistent with the public interest, convenience, and necessity.” § 202(d). Although the Commission retained the rule after the 1996 Act, it stated that it would continue to monitor the impact of the rule on the radio and television industries and would consider further modification of the rule in future biennial reviews. 14 F.C.C.R. at 12,949 ¶ 106.
In 1999, the Radio/Television Cross-Ownership Rule was modified to its current form. The Commission found the growth of media outlets, the efficiencies of joint ownership, and the public service benefits obtained from joint operations all supported its decision to allow common ownership of radio and television stations. Id. at 12,948 ¶ 102. Currently, the Radio/Television Cross-Ownership Rule allows a party to own up to two television stations and up to six radio stations in a market where at least 20 independently owned media voices would remain post-merger. Where parties may own a combination of two television stations and six radio stations, the rule allows a party alternatively to own one television station and seven radio stations. A party may own up to two television stations (as permitted under the local television rule) and up to four radio stations (as permitted under the local radio rule) in markets where, post-merger, at least ten independently owned media voices would remain. A combination of one television station and one radio station is allowed regardless of the number of voices in the market. 47 C.F.R. § 73.3555(c) (2002).
In light of the 1999 relaxation of the rule, the Commission decided to proceed cautiously and monitor the impact of the *450 new rules on diversity and competition. See 2000 Biennial Review, 16 F.C.C.R. 1207, 1218 ¶ 32, 2001 WL 38123 (2001).
In the Order at issue, the Commission repealed both cross-ownership rules and replaced them with more flexible Cross Media Limits, which established more finely-tuned cross-ownership limits in small and medium-sized markets, and placed no restrictions on cross-ownership in large markets beyond the intra-service local caps.
To provide historical perspective, and to place the repeal of the Newspaper/Broadcast Cross-Ownership Rule in proper context, it is important to note that the ban was adopted nearly three decades ago, in a media environment that has been dramatically and irreversibly transformed in the intervening years. In the nearly thirty years since the newspaper/broadcast cross-ownership prohibition was enacted, the media landscape has changed dramatically, as the Commission extensively documents in its Order. Among these changes are the growth of cable, VCRs, satellite video and audio services, and the Internet. Order ¶¶ 106-19. As noted, media outlets per market within broadcast television and radio have grown during this period as well, id. ¶ 121, providing viewers with a multitude of choices not available twenty or even ten years ago. With other technological advancements likely in the near future, the Commission recognized that its rigid rule had become outdated. The FCC concluded that “the question confronting media companies today is not whether they will be able to dominate the distribution of news and information in any market, but whether they will be able to be heard at all among the cacophony of voices vying for the attention of Americans.” Id. ¶ 367.
b. Repeal of Newspaper Broadcast Cross-Ownership Prohibition
The FCC looked to its policy objectives of promoting competition, localism and diversity, and concluded the Newspaper/Broadcast Cross-Ownership Rule (NBCO): 1) was neutral with respect to competition; 2) actually undermined local-ism by preventing newspaper-broadcast mergers that would provide more and higher-quality local news to their markets; and 3) was not necessary to preserve viewpoint diversity in most markets. Id. ¶ 330.
In terms of competition, the Commission concluded “the local newspaper market is distinct from the local broadcasting market,” and therefore “a newspaper/broadcast combination ... cannot adversely affect competition in any product market.” Id. ¶332. Synergies and cost-reductions of cross-ownership could also translate into increased competition. Id. ¶ 337. As discussed, the FCC measured the promotion of localism through two metrics: “the selection of programming responsive to local needs and interests, and local news quantity and quality.” Id. ¶ 78. The FCC determined cross-ownership promotes local-ism because it allows newspaper stations and broadcast stations to pool their resources, allowing the whole of their coverage to exceed the sum of their parts. “Specifically, MOWG Study No. 7 found that while non-network owned but network-affiliated stations provide, on average, 14.9 hours per week of local news and public affairs programming, newspaper-owned affiliated stations provide almost 50% more such programming, averaging 21.9 hours per week.” Id. ¶ 344. In addition, the study found the average number of hours of local news and public affairs programming provided by same-market, commercially owned television-newspaper combinations was 25.6 hours/week, compared to 16.3 hours/week for the sample of *451 television stations owned by out-of-market newspapers. Id. The FCC also found corresponding advantages in quality of local coverage provided by newspaper-owned stations, as shown by ratings (measuring consumer approval) and industry awards (measuring critical approval). Id. ¶ 345. Substantial evidence supports the Commission’s decision that cross-ownership translates into pro-competitive public interest benefits.
The FCC concluded the negative effects of the NBCO Rule on localism hurt diversity as well: if local stations do not have the resources to provide a high quantity and quality of news, the number of strong voices in their market will be diminished. The FCC cited record evidence both supporting and refuting the notion that common ownership leads to common viewpoint among media properties. From this conflicting evidence, the FCC inferred that “although there is evidence to suggest that ownership influences viewpoint, the degree to which it does so cannot be established with any certitude.” Id. ¶ 364.
The Commission also examined the growth in media outlets, including the addition of cable and the Internet as viable news sources. It concluded the large number of new voices rendered the NBCO unnecessary for purposes of protecting diversity, because any loss in independent voices resulting from cross-ownership would, in all but the most concentrated markets, be counterbalanced by the plethora of alternative voices. The Order concluded “competing media outlets abound in markets of all sizes.... ” Id. ¶ 365. Specifically, the Commission pointed to the expanding- role of cable in providing varied content, including local news and public affairs programming. Id. The Order continued, noting:
The Internet, too, is becoming a commonly-used source for news, commentary, community affairs, and national/international information. Seventy-two percent of Americans are now online and spend an average of nine hours weekly on the Internet. MOWG Study No. 3 suggests that consumers generally view Internet news sources as a substitute for daily newspapers and broadcast news ... the Internet does play an important role in the available media mix.
Id. ¶ 365. It is also worth noting that none of the 30 million web sites existing in the year 2000 existed when the NBCO Rule was first adopted.
The record supports: (1) the growth in television and radio outlets; and (2) that cable and the Internet were properly cited in the growth of media outlets. Additionally, the benefits to localism from cross-ownership provide a rational basis for repealing' the blanket prohibition. Moreover, the Agency’s decision on the mixed record is particularly reasonable" in light of the deregulatory tenor of § 202(h).
c. Cross-Media Limits
The record and the Commission’s experience led it to conclude that more narrowly focused limits were necessary in certain specific situations to guard against “an elevated risk of harm to the range and breadth of viewpoints that may be available to the public,” resulting from cross-ownership of media properties. Order ¶ 442. Having examined the record evidence, the Commission reasonably concluded that new limits were necessary “to check the acquisition by any single entity of a dominant position in local media markets-not in economic terms, but in the sense of being able to dominate public debate-through combinations of cross-media properties.” Id. ¶ 432.
In that vein, the FCC adopted a methodology termed the Diversity Index to provide its new media cross-ownership framework with an empirical footing. The *452 Diversity Index takes account of certain media outlets available to consumers, the relative importance of those media as sources of local news, and ownership concentration across these media. Id. ¶ 391. Based on detailed analysis of the record, informed by the Diversity Index, the FCC adopted the following Cross Media Limits:
Number of Television Stations in Market Cross-Ownership Limits
1-3 television stations No cross-ownership of newspapers, radio stations, or television stations.
4-8 television stations Single entity may own a daily newspaper and either: (1) a television station and up to half the maximum number of radio stations allowed by the local radio rules; or (2) no television station and as many radio stations as allowed by the cross-ownership rule. Additionally, a television owner who owns a duopoly (two television stations) may not own a newspaper; likewise, a newspaper owner may only own one television station.
Over 9 television stations No cross-ownership limits.
As noted, in crafting its Cross Media Limits, the FCC drew upon the Diversity Index, which it modeled after the Herfin-dahl-Hirschmann Index (“HHI”). The HHI was originally constructed to measure market concentration in the context of economic competition; if a given market’s HHI was too high, it signaled the market was at risk of being monopolized. By analogy, the FCC used its Diversity Index to determine which media markets presented the highest risk of ownership concentration. Underlying this objective is the premise that media ownership influences viewpoint, so that highly concentrated media ownership could negatively impact the diversity of viewpoints disseminated within a market.
The FCC chose the HHI as its market concentration metric over a simple firm count because of the former’s greater sensitivity for concentration. Id. ¶ 396. The HHI sums the squares of firms’ market shares in a given market. The higher a market’s HHI, the more concentrated it is. For example, an economic market with only one firm (a monopoly) would have an HHI of 10000 (100 squared), while a market shared equally among ten firms (“Market A”) would have an HHI of 1000 (10 times 10 squared). A firm count system would treat Market A as evenly concentrated with a ten-market firm having a market share breakdown of 30-30-5-5-5-5-5-5-5-5 (“Market B”) because each market contains ten firms. In contrast, the HHI supports the intuition that Market B is actually vastly more concentrated, with an HHI of 2000. Furthermore, unlike the firm count system, the HHI recognizes that a merger between two large firms creates a more concentrated market than a merger between two smaller firms. If the two 30% firms merged in Market B, its HHI would rise to 3800, while a merger of two 5% firms would increase the HHI to 2050. The firm count system would undis-cerningly treat both mergers the same, however, by noting that both markets would now have 9 firms instead of 10.
The FCC adapted the HHI to viewpoint diversity by ascertaining different media’s shares of consumers’ local news preferences. MOWG Study No. 8, a nationwide survey, asked respondents to identify sources used in the past seven days for *453 local news and current affairs, offering the following answer choices: “television, newspaper, .radio, Internet, magazines, friends/family, other, none, don’t know, and refuse.” Id. ¶ 402. The Study then asked respondents to identify the sources they had used in the past 7 days for national news. According to Study No. 8, the five leading sources of local news were television, newspapers, radio, the Internet and magazines. In apportioning media shares, however, the FCC decided to discount magazines entirely because they only accounted for 6.8% of respondents’ answers, and only .6% of respondents identified magazines as their “primary” source of local or national news. Furthermore, the Pew Research Center conducted a study that showed only 4.2% of their responses cited news magazines as a source of local or national news. The FCC concluded such small figures for local or national news presaged even lower figures for local news only, because, with isolated exceptions, most magazines are national in focus. Accordingly, the FCC reasoned that magazines would have a negligible weight in the Diversity Index and should properly be excluded, at least until the next biennial review. After excluding magazines, and adjusting the remaining market shares accordingly, the user shares of the remaining four media were 33.8% for television, 28.8% for newspapers, 24.9% for radio and 12.5% for the Internet.
The FCC then explored whether any of the media could be broken down into sub-media (i.e., television into broadcast and cable, newspapers into daily and weekly). The FCC decided to remove cable/satellite stations/providers from the voice pool because it was unclear whether the Study No. 8 respondents who said they received local news from cable television were in reality watching broadcast channels on their cable platforms. Id. ¶ 414. Additionally, local cable stations are only available to approximately one third of all cable subscribers. Id. Thus, the FCC counted only broadcast stations in its television percentage. The Order also notes the exclusion of cable from the Diversity Index will be reviewed in subsequent reviews. Such reviews will include follow-up MOWG questions concerning non-broadcast media. Id.
The FCC broke down newspapers into daily and weekly subcategories, with the survey data indicating that 70.3% of newspaper respondents read dailies and 29.7% read weeklies. The FCC used these weights to divide the total newspaper share (28.8%) among daily (20.2%) and weekly (8.6%) newspapers. Finally, the FCC separated the Internet into cable modem users and “other users.” The Commission’s studies demonstrated the appropriate break-down was 18.3% cable users and 81.7% dial-up or DSL users. Therefore, of the 12.5% of the media market allocated to the Internet, that percentage was broken down into 2.3% for cable users, and 10.2% for dial-up and DSL users.
Having apportioned shares among the various media based on actual use figures, the FCC turned to weighing different outlets within the same media. Here, the Commission moved away from actual use and attributed each outlet an equal share of its media type.[104] In other words, in a market with ten television stations, the FCC did not determine what percentage of viewers actually received their local news from each of the ten stations; it simply apportioned each 10% of the television share, meaning a 3.4% share of the overall local news “market.” The FCC added commonly owned shares together to divide *454 shares of the market by owner. For example, a market with ten television stations, two of which are commonly owned, would have share figures of 6.8 and eight 3.4’s rather than ten shares of 3.4. Similarly, the FCC added cross-owned shares from different media. For example, a market with ten television stations and ten radio stations with one cross-ownership combination would have share figures of 5.9, nine 3.4’s and nine 2.5’s, rather than ten 3.4’s and ten 2.5’s. Once the FCC determined the breakdown of shares amongst various independent owners, it squared those shares and added them together to get the Diversity Index for the market in question. See Order App. C (calculating Diversity Indices for various sample markets).
The FCC then sought to determine the Diversity Indices for various sample markets as a function of their number of Television stations. Specifically, the FCC calculated the Diversity Index for every market in the U.S. with 1-5, 15 or 20 television stations. The FCC then calculated the Diversity Indices for ten randomly selected markets with 6 television stations, 7 television stations, 8 television stations, 9 television stations and 10 television stations; the FCC chose ten-market samples for each television station grouping in the 6-10 station range because so many media markets have 6-10 television stations. Using this data, the FCC determined the average Diversity Index for a market as a function of the number of television stations within that market. Order App. D. The FCC also calculated the average increase in HHI in each tested market that would result from various cross-ownership merger scenarios. Id.
The FCC noted that in antitrust analysis, a market is not considered moderately concentrated until its HHI exceeds 1000. The FCC’s calculations revealed that markets with three or fewer television stations had average Diversity Indices of over 1000, and that any cross-ownership mergers in such small markets would lead to significant Diversity Index increases; consequently, the FCC decided to prohibit any cross-ownership in markets with three or fewer television stations. In markets with four to eight television stations, which had base Diversity Indices below but near 1000,[105] the FCC determined that dangerously large Diversity Index increases would result from daily newspaper-television duopoly mergers, as well as mergers between a daily newspaper, a television station and more than half the radio stations allowed by the local radio rule. Finally, the FCC concluded that large markets, with low indices and modest Diversity Index effects from potential mergers, did not need any cross-ownership regulation at all.
The Diversity Index was not promulgated as an ownership rule. Instead, it played a supporting role in the development of the Cross Media Limits. In adopting the Diversity Index, the FCC noted: “While the Diversity Index is not perfect, nor absolutely precise, it is certainly a useful tool to inform our judgment and decision-making. It provides us with guidance, informing us about the marketplace and giving us a sense of relative weights of different media.” Order ¶ 391. As the Commission stated, the “cross-media limits are based on a set of assumptions drawn directly from the record evidence in this proceeding ... the CML [Cross Media Limits] ... ultimately rest[ ] on our independent judgments about the kinds of markets that are most at-risk for viewpoint concentration, and the kinds of transactions that pose the greatest threat *455 to diversity.” Id. ¶ 435. In the end, the Diversity Index provided the Commission with a rough picture of the amount of media diversity concentration in markets, and how changes as a result of cross-media combinations could affect the level of diversity in markets.
The Commission’s use of the Diversity Index constitutes a rational effort to lend a factual foundation to a thorny regulatory question. The development of the Diversity Index represents a bona fide approach that employs empirical evidence to measure and inform policy choices, which do not easily lend themselves to calculation. I would affirm the Commission’s effort to lend a modicum of empirical support to a regulatory issue that had not been fully revisited in nearly thirty years. Perhaps other measures might have been employed, but the development and use of the Diversity Index was rational and reasonable, and clearly neither arbitrary nor capricious. The FCC sufficiently demonstrated the new rule was “necessary in the public interest.”
2. Local Television Ownership Rule
Adopted in 1964, the Commission’s “duopoly” rule prohibited ownership or control of television stations with overlapping Grade B signal contours. 47 C.F.R. § 73.3555(b) (1998). Section 202(c)(2) of the 1996 Act instructed the Commission to conduct a rulemaking “to retain, modify, or eliminate” its local television ownership limitations. 110 Stat. 111. Under the 1996 Act, the Commission adopted rules permitting common ownership of two television stations with overlapping contours, so long as (1) one of the two stations is not ranked among the top four, and (2) at least eight independently owned full-power corn-mercial and noncommercial stations remain in the market after the merger. 47 C.F.R. § 73.3555(b) (2002).
This rule was remanded to the Commission by the Court of Appeals for the D.C. Circuit in Sinclair, 284 F.3d 148. In that case, the court affirmed that “the local ownership rule furthers diversity at the local level and is necessary in the ‘public interest’ under § 202(h),” id. at 160, but held that the FCC had not justified different definitions of “voices” in the local television and radio-television cross-ownership rules. Id. at 165. The court held that the Commission had “failed to demonstrate” why it excluded non-broadcast media from the ownership rules’ eight-voices test. Id.
On remand, the agency modified the Local Television Ownership Rule. The Commission determined the old local television rule was not necessary to further public interest in competition and viewpoint diversity. Order ¶ 133. But the Agency determined that some ownership limits remained necessary to promote competition. Id. The modified rule permits common ownership of up to two commercial stations in markets that have 17 or fewer full-power commercial and non-commercial stations, and up to three commercial stations in markets that have 18 or more stations. Id. ¶ 186. The Agency also prohibited combinations which would result in a single entity acquiring more than one station ranked in the top four in the market based on audience share. Id. Therefore, the rule prohibits ownership of more than one television station in any market with fewer than five television stations.[106] Id. The new local television limits are reproduced in the following table:
*456 Number of stations in a Market Number of combinations allowed
No combinations (per operation of the top-four four or fewer_restriction)._
Two stations may be combined, as long as both of five to seventeen the combining stations are not in the top four.
Three stations may be combined, as long as two of the combining stations are not in the top eighteen or more four.
The Commission found the common ownership of television stations in local markets can “result in consumer welfare enhancing efficiencies,” by eliminating redundant expenses and increasing opportunities for “cross-promotion and counter-programming.” Id. ¶ 147. These efficiencies would enable local broadcasters to better compete with cable and digital providers and would also “spur the transition to digital television,” which the FCC identified as a goal in the public interest. Id. ¶ 148.
Such common ownership was not found to have a detrimental effect on audience ratings. Id. ¶ 150. Importantly, the Commission concluded that “owners/operators of same-market combinations have the ability and incentive to offer more programming responsive to the needs and interests of their communities and that in many cases, that is what they do.” Id. ¶ 164. In fact, “[a]udience share data ... reveals that common ownership of two broadcast television stations has generally improved audience ratings.”- Id. ¶ 150.
According to the Commission, the new rule does not compromise its diversity goals because the modified caps ensure at least six firms in markets with twelve or more stations. Id. ¶ 207. The Commission explained that it would permit additional concentration in markets with less than twelve television stations because the economies of local stations justified an increase in market concentration as markets get smaller. Id. ¶ 201. Indeed, the Commission noted that its local television rule — designed to protect competition— necessarily also protects diversity. Id. ¶¶ 178, 180. Additionally, the Commission pointed out that television broadcast stations are not the only media contributing to viewpoint diversity in local markets. Numerous other sources for news are available, even within the delivered video market. See, e.g., 17 F.C.C.R. 26,901, 26,-909-52 ¶¶ 15-111.
In regard to the top-four restriction, the Commission explained, “in local markets, there is a general separation between the audience shares of the top four-ranked stations and audience shares of the other stations in the market.” Order ¶ 195. Therefore, these mergers would often lead to significant increases in market consolidation. In addition, the Commission found that combinations of the top-four stations were less likely to yield public interest benefits in terms of local news or improved technology. Id. ¶ 199.
The FCC further justified the specific numerical caps in its local television ownership rule by employing the Department of Justice and Federal Trade Commission’s “standard approach” to evaluating competitive harms of an increase in horizontal market concentration: as noted, the Herfindahl-Hirschmann Index. In developing the new local ownership tiers, the FCC looked to the HHI used in merger analysis, selecting an HHI of 1800 as the benchmark for competitively suspect combinations. The DOJ/FTC merger guidelines recognize the HHI level of 1800 as the maximum level for “moderate” concentration. The FCC selected the upper *457 bound for moderate concentration, instead of the lower bound of 1000, in recognition of the competitive pressures exerted by the cable networks. Id. ¶ 192. The ownership rules ensure that in markets with 12 or more stations, there will be at least six competing firms. Id. 11207. Six equal-sized competitors in a market corresponds to an HHI of 1800. While the rule allows for fewer firms in smaller markets, the Commission explained that such increased levels of concentration were justified by the economics of smaller market stations. Id. ¶ 201.
The Commission justified its assumption of equal-share television stations. Television market shares vary widely. Id. ¶ 193. Due to shifts in programming popularity and product innovation, market shares in broadcasting are more fluid than in other industries. The Commission found that television shares can shift substantially over the life of a firm’s investment in a particular station. Thus, in constructing its rules, the Commission focused on “a firm’s ‘capacity’ to deliver programming” — i.e., “the number of licenses that a firm controls in a market.” Id. As the Commission explained, license caps — as opposed to limits on market share — are well-suited to serve the Commission’s diversity goals. Id. ¶¶ 129, 178. The Commission’s amendment of the local television rule is well-supported by the record and would provide a benchmark for future revisions.
3. Local Radio Ownership Rule
For many years the Commission limited local radio ownership to no more than one AM and FM station with overlapping signal contours. See, e.g., Amendment of Section 73.3555 of the Commission’s Rides, 4 F.C.C.R. 1723, 1723 ¶¶ 5-6, 1989 WL 511018 (1989). In 1992 the Commission relaxed its rules to permit common ownership of radio stations in line with the size of various local market tiers. Revision of Radio Rules and Policies, 7 F.C.C.R. 2755, 2776 ¶ 40, 1992 WL 689675 (1992), on reconsideration, 7 F.C.C.R. 6387, 1992 WL 690638 (1992). In its 1992 rulemaking, the Commission considered using the Arbitron rating service to define radio markets, and the number of stations in the market. Id. at 2778 ¶ 45. In the end, however, the Agency decided to define radio markets based on signal contour overlap.[107]
Section 202(b)(1) of the 1996 Act required the FCC to revise its limits on the number of stations an entity could own in a particular market by adjusting both the market tiers and the numerical limits. See Implementations of Sections 202(a) and 202(b)(1) of the Telecommunications Act of 1996 (Broadcast Radio Ownership), 11 F.C.C.R. 12,368, 1996 WL 740755 (1996). The 1996 Act expanded multiple radio station ownership rights by setting the following common ownership limits: eight stations in markets with forty-five or more stations, with five or fewer in the same service (AM or FM), § 202(b)(1)(A); seven stations in markets with thirty to forty-four stations, with four or fewer in the same service, § 202(b)(1)(B); six stations in markets with fifteen to twenty-nine stations, with four or fewer in the same service, § 202(b)(1)(C); and five stations in markets with fifteen to twenty-nine stations, with three or fewer in the same service, provided that no single entity could own more than fifty percent of the stations in such market, § 202(b)(1)(D). Congress authorized the FCC to further relax these limitations in order to permit greater common ownership if such ownership “will result in an *458 increase in the number of radio broadcast stations in operation.” § 202(b)(2). The limits are summarized below:
Number of stations a party-may own which are of the Number of commercial Number of stations a party same service (AM or stations in market:_may own:___FM):_
45 or more_8_5_
between 30 and 44_7_4_
between 15 and 29_6_4_
5 [with the exception that a party cannot own more than 50% of the stations 14 or fewer_in such market!3
The new limits imposed by Congress will be regularly reviewed as the 1996 Act required the FCC to review biennially (now quadrennially) its media ownership rules and modify or repeal those it found not “necessary in the public interest.” 1996 Act, § 202(h).
At the time Congress instituted these changes, the FCC defined a radio market as the geographic area covered by the overlapping contours of the stations proposed for common ownership. See 47 C.F.R. § 73.3555(a)(1) (1995). Under that definition, local markets were determined with reference to stations’ “principal community contour” — essentially, the area reached by a station’s signal at a certain level of strength. See id. § 73.3555(a)(3). For each proposed combination of stations, the local market was defined by “the number of ... stations whose principal community contours overlap, in whole or in part, with the principal community contours of the stations” that were proposed to be commonly owned. Id. Nothing in the 1996 Act addressed the methodology for defining radio markets or identifying the number of radio stations in a market for purposes of the ownership rules.
The FCC initiated a rulemaking to change the definition of radio markets. 1998 Biennial Reg’y Review — Review of the Commission’s Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, 15 F.C.C.R. 11,058, 11,091-94, 2000 WL 791562 (2000). In this review, the Commission expressed concern that its method of defining markets and identifying stations in the market led to “unrealistic results,” and were both “illogical” and “contrary to Congress’ intent.” Id. 11093-94 ¶ 65, 67. Therefore, the Commission commenced a proceeding seeking comment on whether and how it should modify the way in which it “determine^ the dimensions of radio markets and count[s] the number of stations in them.” Definition of Radio Markets, 15 F.C.C.R. 25,077 ¶ 1, 2000 WL 1827671 (2001). The FCC eventually consolidated that rulemaking with another proceeding regarding the local radio ownership rules, Rules and Policies Concerning Multiple Ownership of Radio Broadcast Stations in Local Markets; Definition of Radio Market, 16 F.C.C.R. 19,861 ¶ 1, and then rolled the entire proceeding into the 2002 biennial review. See Omnibus NPRM, 17 F.C.C.R. at 18,506.
Since the passage of the 1996 Act, record evidence demonstrates dramatic transformation in the radio industry. In each of the last six years, about 20% of U.S. radio stations have changed hands in a frenzy of deal-making. From 1996 to *459 2002, the number of radio stations owners declined by 34% even though the number of commercial stations increased by 5.4%. Within individual markets, small numbers of large owners often dominate. The audience shares of the top four firms in smaller markets are even higher than in larger markets. The audience share of the top four firms in markets 51-100 and 101-289 is 92.5% and 93.9% respectively. This has led to high market concentrations, as measured by the HHI. When conducting its 2002 biennial review, the FCC was faced with significant consolidation in radio markets.
In the Order at issue, the Commission determined that it should retain the numerical limits in the local radio rule, but that it should revise the contour overlap method. The FCC proposed to replace the contour-overlap methodology with a geographic methodology, based on the Arbitron Metro Survey Areas. Arbitron, the principal radio rating service in the country, has defined radio markets (called Arbitron Metros) for most of the more populated urban areas of the country. Arbitron Metros are based on Metropolitan Areas established by the Office of Management and Budget.
The geography-based, Arbitron Market definition relies on the market definitions of Arbitron radio rating service, a private entity that measures local radio station audiences for its customer stations. See Order ¶¶ 275-76.[108] Additionally, the Agency decided to include commercial and non-commercial stations that are licensed to a community in the relevant Arbitron Metro,[109] as well as stations located outside the Metro that attract a minimum level of listenership in the Metro, see id. ¶¶ 279-81, 295, in calculating the relevant local radio market.
The Commission identified several flaws in the manner in which it presently defines radio markets, the contour-overlap market definition. Id. ¶239. One major flaw is known as the “Pine Buff’ problem or “numerator-denominator” ' inconsistency. The FCC described the inconsistency this way:
[A] party is deemed to own only those stations that are represented in the numerator, ie., stations that have mutually overlapping principal community contours. In calculating the denominator, however, any radio station whose principle community contour overlaps the principal community contour of at least one of the radio stations in the numerator is counted as being in the market, regardless of who owns the station. As a result, the denominator may include radio stations that are owned by the same party that owns the radio stations represented in the numerator. Because those stations are counted in the denominator, they are by definition “in” the market, but they would not count against the party’s ownership limit in that market unless their principal community contours overlap the princi *460 pal community contours of all the radio stations in the numerator.
Id. ¶ 253.
Numerator-denominator inconsistency causes two potential problems. First, because commonly owned stations in the denominator are not counted in the numerator, a party could use its own radio stations to increase the size of a market and “bump” itself into a higher ownership tier. The more common occurrence, according to the FCC, is that the inconsistency allows a party to own radio stations in the relevant market without having those stations count against the party’s ownership limits. The contour-overlap methodology thus allows entities to circumvent the ownership limits, which are intended to promote competition and “to protect against excessive concentration levels in local radio markets.” Id. ¶ 254.
The FCC also determined this irrationality in the contour-overlap methodology could not be fixed. If commonly owned stations are excluded from the denominator, then market size would be contingent upon who owned what station, “a distinction that would be both unprincipled and unprecedented in the history of competition analysis.” Id. ¶ 255. If all commonly owned stations in the denominator are included in the numerator, “a party’s ownership level in a particular market may be overly inflated by outlying stations far from the area of concentration.” Id. Further, the FCC’s interim adoption of a modified contour-overlap methodology for non-Arbitron Metro areas does not repudiate these findings. The FCC concluded temporary use of the old method was unavoidable during the pendency of the rulemak-ing process. Id. ¶ 283. And because this method was well-understood, it at least had the benefit of permitting orderly processing of radio station applications. The FCC noted, however, that the adjustments made could only “minimize the more problematic aspects of that system.” Id. ¶ 285.
The contour-overlap approach is contrary to traditional antitrust principles, which employ “relevant geographic markets” for purposes of competition analysis. Though radio stations are signal-based products, the FCC effectively addressed this point by noting: “[rjadio stations serve people, not land,” and “people in the United States tend to be clustered around specific population centers.” Id. ¶ 273. This is demonstrated by the fact that the 287 Arbitron Metros cover only 30% of the counties in the United States, but cover 78% of the population above the age of twelve. Id. ¶282. It is also noteworthy that the Justice Department often treats Arbitron Metros as the relevant market for antitrust purposes. See United States v. CBS Corp. and Am. Radio Sys. Corp., Proposed Final Judgment and Competitive Impact Statement, 63 Fed. Reg. 18036, 18044-45 (Apr. 13, 1998). “The fact that radio signals are not congruent with geographic boundaries does not undermine the logic of relying on geographic areas to define radio markets.” Order ¶ 273.
In addition, the “subjective market” problem has other drawbacks. Because stations with larger signal contours are more likely to create larger radio markets, the contour-overlap methodology disproportionately encourages the consolidation of powerful stations relative to smaller stations. Also, radio stations may overlap only a very small portion of a given “market.” So while they are part of that market, these stations may be unable to serve effectively the listeners or advertisers affected by the proposed consolidation. Finally, the fact that every “market” is unique frustrates the FCC’s ability to benchmark and compute the level of consolidation in a given area.
*461 The FCC not only discussed the flaws in the contour-overlap methodology but also addressed concerns raised about the Arbitron Metro methodology. As the FCC conceded, “any methodology we develop may create anomalous situations in certain instances. But we cannot agree that our inability to achieve perfection in every instance justifies maintaining the current system.” Id. ¶ 263. The FCC established safeguards to deter parties from attempting to manipulate Aribtron market definitions. Specifically, a radio station licensed by a community outside the Metro will not be considered “home” to a Metro for purposes of the ownership rules until that change has been in place for two years. Similarly, changes in Metro boundaries will be subject to a similar two year rule. The FCC believed these safeguards will ensure that changes made to Arbitron Metros will be made “to reflect actual market conditions and not to circumvent the local radio ownership rule.” Id. ¶ 278.
The FCC cited several reasons why the Arbitron Metro methodology is a more rational way to define radio markets than the contour method. As stated, Arbitron Metros are consistently considered the relevant geographic market for antitrust purposes. Arbitron market definitions are also industry standards. It is reasonable for an agency to rely on industry defined standards. See AT&T Corp. v. FCC, 220 F.3d 607, 627 (D.C.Cir.2000) (stating that the FCC’s reliance on “industry-approved metrics” in lieu of conducting its own competition study was not arbitrary and capricious).
Whether the contour-overlap methodology or the Arbitron Metro methodology more effectively promotes competition between radio stations cannot easily be quantified. Cf. NCCB, 436 U.S. at 796-97, 98 S.Ct. 2096 (rejecting argument that the rulemaking record did not demonstrate the new rule would in fact lead to increased diversity and stating that “diversity and its effects” are “elusive concepts” and “not easily defined”). “To restrict the Commission’s action to cases in which tangible evidence appropriate for judicial determination is available would disregard a major reason for the creation of administrative agencies, better equipped as they are for weighing intangibles by specialization, by insight gained through experience, and by more flexible procedure.” FCC v. RCA Communications, 346 U.S. 86, 96, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (internal quotations omitted). As discussed, ■ the FCC provided several reasons why it believed the Arbitron Metro methodology is superi- or to the contour-overlap methodology. This type of “line-drawing” determination is entitled to “broad leeway” and deference. Sinclair, 284 F.3d at 159. An agency is “free to change its position” if it supplies “adequate data and a reasoned analysis to support the change.” Natural Resources Def. Council, Inc. v. E.P.A., 790 F.2d 289, 298 (3d Cir.1986). The FCC met this burden with respect to its decision to switch from the contour-overlap market definition to Arbitron Metros.
Having settled on a revised local radio market definition, the Commission reaffirmed the ownership tiers established by Congress in the 1996 Act. The Commission emphasized that “[njumerical limits help to keep the available capacity from becoming ‘locked-up’ in the hands of one or a few owners, and thus help prevent the formation of market power” in competing for listeners. Order ¶ 288. The Commission observed that “[t]he current tiers ensure that, in markets with between 27 and 51 radio stations, there will be approximately five or six radio firms of roughly equal size,” and that many of the top 100 metro markets fall within that range. Id. ¶ 289. Finding “that the concentration levels permitted by the current rule represent a *462 reasonable and necessary balance for radio broadcasting that comports with general competition theory,” the Commission “decline[d] to relax the rule to permit greater consolidation.” Id. ¶ 290. The Commission also decided against more restrictive limits. The Commission recognized, however, “that greater levels of concentration may be needed to ensure the potential for viability of radio stations in smaller markets.” Id. ¶ 292.
As with broadcast television, the Commission found that radio audience shares can change over time, and an appropriate evaluation of radio markets structure must take into account that licenses provide radio stations with the capacity to provide more popular programming. See id. ¶ 288. The Commission’s assumption of equal shares when choosing its ownership limits takes account of these considerations. The Commission recognized that over the life of a firm’s investment in a radio station, the market share of all stations in the market can shift substantially. Accordingly, the Commission chose an approach that counts all stations in the market as having similar capacity to compete for listeners. In evaluating the local radio ownership limits, the Commission sought “both to ensure a healthy, competitive radio market by enabling radio owners to achieve significant efficiencies though consolidation of broadcast facilities,” while at the same time “ensuring] that such consolidation does not ... stifl[e] competitive incentives.” Id. ¶293.
I agree with the Commission’s determination that numerical limits on radio station ownership help preserve the limited number of station licenses from being monopolized by a few owners and help prevent the formation of market power. While interested parties may have struck the balance at a different point, or suggested rules that promoted different market structures, the line was the Commission’s to draw. NCCB, 436 U.S. at 814-15, 98 S.Ct. 2096. The record supports its reasonable decision, which is neither arbitrary nor capricious.
The Commission also revised its rule to count noncommercial stations as part of the local radio market in order to account for the fact that such stations exert competitive pressures in the listening and program production markets. Order ¶ 239. The Agency found because “noncommercial stations ... receive a significant listening share in their respective markets,” their existence “exerts competitive pressure on all other radio stations in the market.” Id. ¶ 295. Additionally, noncommercial stations count in determining the size of the local market. Id. The FCC also determined it would prohibit the transfer of station combinations that violate the local radio ownership rule at the time of sale, subject to a limited exception for sales to “eligible entities.”[110] Id. ¶ 489. The FCC found the disadvantages of allowing the transfer of combinations which do not comport with the ownership limits are not outweighed by countervailing considerations, such as owners’ expectancy. Id. ¶ 487.
The FCC determined that Joint Sales Agreements[111] should be attributable to *463 the brokering licensee under the new rules.[112] Id. ¶ 317. Where an entity owns or has an attributable interest in one or more stations in a local radio market, joint advertising sales of another station in that market for more than 15 percent of the brokered station’s advertising time per week will result in counting the brokered station toward the brokering licensee’s ownership caps. Id. The FCC justified this change in the attribution rule with its finding that in-market JSAs above the 15% threshold convey to the brokering entity a degree of “influence or control” sufficient to warrant attribution under the ownership rules. Id. ¶ 318. The FCC gave licensees two years from the effective date of its Order to terminate sales and programming agreements that do not comply with the modified local radio ownership rules, and declined to allow any transfers on non-compliant combinations that included the newly attributable sales and programming agreements. Id. ¶¶325, 491. I find the Commission’s conclusions in the Local Radio Ownership Rule to be reasonable, and clearly not arbitrary and capricious.
For the reasons stated, I believe the Agency sufficiently supported its rule changes. The Commission’s decisions were neither arbitrary nor capricious, were supported by the record and are in the public interest. The majority affirms some of the Commission’s conclusions as well. I concur with the majority in its affirmance of certain of the Commission’s conclusions. For the Cross-Ownership Rules, I agree the Commission’s decision not to retain a ban on newspaper/broadcast cross-ownership is justified under § 202(h) and is supported by record evidence, and the Commission’s decision to retain some limits on common ownership of different-type media outlets was constitutional and did not violate § 202(h). For the Local Television Ownership Rule, I agree the Commission’s decision to retain the top-four restriction is justified and the threshold challenges to the Commission’s regulatory approach fail. For the Local Radio Ownership Rule, I agree the Commission justified the switch to Arbitron Markets, that the Commission was warranted in . including noncommercial stations, and the transfer restriction and attribution of Joint Sales Agreements should be upheld. I now turn to those areas where the majority finds the Commission’s decisions unsupported.
IV. Engaging Flaws Found by the Majority
A. Cross-Ownership Rule and the Diversity Index
The majority criticizes the weight given to the Internet in the Diversity Index, as well as the Commission’s decision to attribute equal market shares to different outlets within the same media type. The majority also finds the Commission inconsistently derived the Cross Media Limits from the Diversity Index. Finally, the majority requires specific notice of the Diversity Index on remand.
Before addressing these conclusions, it bears reiterating, as the Supreme Court recognized in FCC v. NCCB, that “[d]i- *464 versity and its effects are ... elusive concepts, not easily defined let alone measured without making qualitative judgments on both policy and First Amendment grounds.” 436 U.S. at 796-97, 98 S.Ct. 2096 (internal quotations omitted). In reviewing the Agency’s methodological choices and line-drawing in these areas, the Commission’s determinations deserve deference. See Sinclair, 284 F.3d at 159. Furthermore, I agree with the Commission’s explanation that the Diversity Index is not the final rule, nor the sole consideration relied upon, but rather a tool created to provide the Cross Media Limits with empirical footing. As such, the Agency’s choice and formulation of a metric should be granted deference unless it can be shown to be unreasonable. The majority falls short of such a showing.
1. Weight Attributed to the Internet
The Order concludes that diversity is best measured by outlets that provide local news. Order ¶ 391. The majority claims the Diversity Index grants too much weight to the Internet, understating the level of market concentration and overstating the level of diversity in a given market.[113] Although conceding the Internet contributes to viewpoint diversity, the majority states, “we believe that the Commission gave too much weight to the Internet in deriving the Cross-Media Limits.” But the Commission’s line-drawing is not arbitrary or capricious. The majority has substituted its judgment for that of the FCC.
Although the majority finds the exclusion of cable from the Diversity Index to be justified, it holds the FCC’s differential treatment of the Internet versus cable is unsupported. The FCC excluded cable because of serious doubts as to the extent cable provided independent local news as opposed to merely transmitting broadcast signals. The majority finds the Internet also largely transmits local news by providing another platform for local newspapers and broadcast stations. The majority holds the FCC must somehow discount responses that relied on websites that republished information reported by a broadcast or newspaper counterpart, or provide more persuasive evidence of significant independent local news on the Internet.
To provide a reference point, the FCC’s distinction between cable and the Internet is distinguishable from the Commission’s unsupported and conflicting definition of “voices” in Sinclair. See 284 F.3d at 162-65. In that case, the Court of Appeals for the D.C. Circuit noted the choice of eight competing voices and the definition of voices in the Commission’s local television rule “are quintessentially matters of line drawing invoking the Commission’s expertise in projecting market results.” Id. at 162. But the court invalidated the Commission’s definition of voices because the FCC did not adequately explain why it included only broadcast television stations as voices. Id. at 165. The court also found the Commission failed to explain its different definitions of “voices” in its local ownership rule and its cross ownership rule. Id. at 162.
In the Order at issue in Sinclair, the Commission provided two reasons for limiting its definition of voices. The first was a Roper Study, which “at no point ... eompare[d] broadcast to non-broadcast television as sources of news, much less as sources of local news. Rather the Roper study simply indicated that nearly 70% of *465 adults get most of their news from television .... ” Id. at 163. The second reason “involved ‘the unresolved questions about the extent to which [non-broadcast] alternatives are widely accessible and provide meaningful substitutes to broadcast stations.’ ” Id. at 164 (quoting Local Ownership Order P. 33, 64 Fed. Reg. 50,651). The Commission concluded that “in the absence of ‘definitive empirical studies quantifying the extent to which the various media are substitutable in local markets,’ the ‘unresolved questions’ on substitutability precluded further relaxation of local ownership restrictions.” Id. The court determined that this “wait-and-see approach ... cannot be squared with [the Commission’s] statutory mandate ... to ‘repeal or modify’ any rule that is not ‘necessary in the public interest.’ ” Id. (quoting Fox Television Stations, 280 F.3d at 1042.).
In this Order, the Commission’s methodologies, studies and analyses are significantly more comprehensive than in the Local Ownership Order reviewed in Sinclair. The Commission has presented valid reasons to exclude cable from the Diversity Index while including the Internet at a weight of 12.5%. Although not perfect, the MOWG studies are a significant improvement over the study in Sinclair, which did not compare broadcast television to cable television as a source of news. In the Order reviewed here, the Commission presents evidence on the substitutability of various media as news sources. See Order ¶ 409. The studies relied on by the Commission, the Diversity Index, and resulting Cross-Ownership Rule represent a reasonable approach to establish rational guidelines and are not arbitrary or capricious.
Contending the Internet provides predominantly national news, the majority disputes whether the Internet is a significant source of local news. The majority also notes that most people who go online for local news merely check the websites of their local newspaper or broadcast stations. The survey relied on by the Commission, MOWG Study No. 8, did not identify which websites respondents used as sources of local news.[114] This omission can be fine-tuned on the next round of reviews, but, in my mind, because it does not approach the level of arbitrary or capricious action, it need not be remanded, further delaying the implementation of the Commission’s rules. The Commission responds that the Internet provides online-only news sites such as Salon.com,[115] online-only collections of news such as the Drudge Report,[116] and otherwise provides a vast universe of information not contained in local newspapers or broadcasts.[117] Order ¶ 427.
Although formal local news sites on the Internet are occasionally online platforms for newspapers and broadcast stations, in *466 dividuals may nonetheless receive news from various local websites that directly transmit their own “news,” rather than collect it as “news.” Reply Comments of Media Gen., Inc., at 15-16. As the Commission noted, “[although many local newspaper and broadcast stations maintain websites with news content, that does not begin to plumb the extent of news sources on the Internet.” Order ¶ 427. I agree. The majority contends the FCC should have discounted responses suggesting Internet use was constrained to online platforms for real world media. Even assuming the Commission had sufficient data to make such a calculation in this biennial review, it is not clear 12.5% was an inappropriate weight to attribute to the Internet. With future Internet growth, the Internet familiarity of the next generation of media users, and the fact that local information can be received outside of one’s geographic locality, the Commission likely understated the Internet media share. These considerations only emphasize that determining the appropriate weight for each media source is as much art as science, and the choice of 12.5% was reasonable.
At several places in the Order, the Commission supported its chosen weight for the Internet in the Diversity Index. The FCC found, “[t]he web provides an unrestrained forum for the dissemination and consumption of ideas.” Order ¶ 119. The Commission also found that the Internet “is becoming a commonly-used source for news, commentary, community affairs and national/international information.” Id. ¶365. These findings are amply supported by record evidence. See Media Gen. Comments, App. 9; see also Media Gen. Reply Comments. Comments from Media General, as well as those from Hearst Corporation (referenced in the Order at ¶ 365) pointed to the existence of a significant number of local, independent websites on the Internet.[118] Comments providing examples of websites with local content explicitly noted these examples represented a fraction of the websites with local content existing on the World Wide Web. See Media General Comments, 22-23 n. 50 (“Indeed, there is no way in which Media General’s work could ever result in an exhaustive and complete list.... With more work, the totals could have easily trebled or quadrupled.”). In its Order, the Commission noted 30 million websites existed in 2000. Order ¶ 117. The meteoric growth in the number of sites, as well as the sheer number of sites further belie the majority’s contention that independent local content does not exist in substantial amount on the Internet. In formulating its Diversity Index, the Commission made clear it looked to potential sources of viewpoint. Id. ¶ 425. The sheer number of available outlets on the Internet supports the Internet’s inclusion at 12.5%.
Moreover, the record contains a significant number of websites for local government bodies and civic organizations. See, e.g., Hearst Corp. Comments, MM Docket No. 01-235, at 11 & n. 36, Apps. A, C. As the Commission found, “[tjhere is a virtual universe of information sources on the Internet and there are websites not maintained by existing news media conveying information on everything from fringe political groups to local civic events. We cannot pretend that these are not in the ‘diversity’ mix simply because only a small number of people may visit them.” Order ¶ 427. The majority responds that “to accept [the Commission’s] ‘universe of infor *467 mation’ characterization of the Internet’s viewpoint diversity, we would also have to disregard the Commission’s professed intent to focus its consideration of viewpoint diversity on media outlets.” The majority continues, “local governments are not, themselves, ‘media outlets’ for viewpoint-diversity purposes. Like many entities, they just happen to use a particular media outlet — the Internet — to disseminate information.”
I cannot agree with the majority’s characterization. Government web sites are media outlets within the media type of the Internet. Particular websites- — like stations within the television and radio mediums — are outlets. See Order ¶427 & n. 939 (referring to websites, stations, and publications as “information sources,” not “types” of media). Also, the Commission has not excluded government and civic organization websites from its consideration in the Diversity Index. The Commission specifically avoided this sort of content analysis. See id. ¶ 424. These sites are relevant to diversity so long as they provide news and current affairs. The majority falls short of showing these sites fail to provide this service.[119] Again, the choice not to exclude local government web sites from the diversity mix is a choice properly within the purview of the Agency. Their inclusion is neither arbitrary nor capricious.[120]
Beyond specific websites, other factors, discussed in the Order, support the weight the Commission attributed to the Internet. According to the Commission, the Internet lends itself to diverse viewpoints because of its combination of breadth and accessibility. As the Order noted, “accessing Web content is a highly individualized activity.” Order ¶ 118. Simply typing a search into a search engine can produce numerous relevant websites. The breadth of the Internet allows access to specific issues at the click of a mouse. For example, a recent search revealed a number of websites relating to the extension of a bike path on the Schuylkill River in Center City Philadelphia. See e.g., http://freetheriver-park.typepad.com/ (newsletter of path access advocacy group) (last visited June 24, 2004); http://www.centercityresidents.org/ SRPaccess.htm (letter in support of park access from Center City Resident’s Association) (last visited June 24, 2004).
Moreover, the Internet is unconstrained and provides a forum for a limitless number of voices and viewpoints. Recognizing the potential for viewpoint dissemination, political groups have taken their message *468 to the Internet en masse. See e.g., Larry Fish, New Web Politics: Social Networking, Phila. Inquirer, April 27, 2004, at B1 (discussing political candidates’ use of the Internet as a campaign tool). Media watchdog sites provide an alternative to a specific political view in significant numbers. See e.g., Jim Ruttenberg, New Internet Site Turns Critical Eyes and Ears to the Right, N.Y. Times, May 3, 2004, at A21 (describing Internet site, www.me-diamatters.org, where liberal commentators monitor and counter conservative online and on-air commentators). Internet news sites have sprouted specifically to provide independent, local news. A particularly good example is the Independent Media Center of Philadelphia, see www.phillyimc.org, which over one million people have visited to access independent news since its founding in 2000. See www.phillyimc.org/about.shtmh Finally, interactive possibilities on the Internet such as message boards and chat rooms permit virtually unlimited viewpoint dissemination from a multitude of independent “sources.” The Commission recognized the unique qualities of the Internet as they relate to diversity: .
Whereas other forms of media allow for only a finite number of voices and editorially-controlled viewpoints, the Internet provides the forum for an unlimited number of voices, independently administered. Furthermore, content bn the Web is multi-media; it can be read, viewed, and heard simultaneously. Since Web pages are stored on Web-hosting file servers, accessing Web content is a highly individualized activity, and any individual with access to a Web browser can access all available Web content 24-hours a day throughout the world.
Order ¶ 118.
After reviewing numerous websites referenced in the FCC’s Order and supporting comments, I am convinced that the Commission acted reasonably by including the Internet in the Diversity Index at 12.5%. With over 70% of Americans now online,[121] the FCC acted reasonably in counting the Internet as a significant addition to the media marketplace. Assigning the Internet a reasonable percentage of the overall market is a task within the range of Agency discretion. In any event, its assigned weights cannot be termed arbitrary and capricious. The Commission has committed to review the apportioning of media shares in its next review. Order ¶ 414; see also Am. Family Ass’n, 365 F.3d at 1166 (discussing the Commission’s “duty to evaluate its policies over time to ascertain whether they work — that is, whether they actually produce the benefits the Commission originally predicted they would”) (internal quotations omitted). Each review should bring the Diversity Index — or whatever metric the Commission chooses to measure diversity — closer to the true manner in which individuals actually get their information. Based on today’s media marketplace, excluding the Internet from the Diversity Index, or limiting its importance, would have sent the Commission down an arbitrary path. The Cross Media Limits and the underlying Diversity Index constitute a worthy benchmark from which the Commission can continue to refine its Cross Ownership Rule. The Commission’s rules are clearly not arbitrary and capricious.
*469 As noted, I believe the Commission supported its treatment of the Internet in the Cross-Media Limits. Nonetheless, in the coming years, the Internet will present challenges for the Commission. In future quadrennial reviews, the FCC may want to reconsider how the Internet fits into the traditional concepts of measuring viewpoint diversity, especially the emphasis on local news. By nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries. This fact should not undervalue this critical media as an important source for the dissemination of diverse information. In this respect, new modes to characterize diversity may be required. The Internet allows a dentist in Iraq to post a weblog with daily entries and photos from Baghdad for viewing anywhere in the world. See http://healingiraq.blog-spot.com (last visited May 23, 2004). Because this information may not qualify as “local news,” it does not follow it should be excluded from the viewpoint diversity mix. Although independent news is all-important, the ability to replicate and distribute news on the Internet, long after its original published date, may cause the Commission to rethink its sole emphasis on “independent” sources when crafting future rules.
2. Equal Market Shares Within Media Type in the Diversity Index
The majority finds the Commission did not justify its decision to assign outlets of the same media type equal market shares. As noted, the FCC first apportioned shares based on actual use figures. But when weighing outlets within the same medium, it counted outlets equally.[122] In light of its expertise and delegated authority to make these kinds of policy choices, as well as the underlying goal of viewpoint availability, I would affirm the Commission’s decision to focus on media availability, rather than market share. Therefore, I would affirm the Commission’s use of equal shares. Whether the assumption of equal market shares within media types is the perfect solution to a complex regulatory problem in every market is subject to legitimate debate. But I see no, principled basis to invalidate the Commission’s reasoned approach.
In constructing the Diversity Index, the FCC concluded that actual use data is reliable for differentiating among media types because a respondent who relies on television for local news will probably not switch to radio or newspaper because of inherent differences between the media. Order ¶ 409. When it came to weighing outlets within the same medium, however, the Commission decided to focus on an outlet’s capacity to deliver information, rather than viewership or readership. This decision is supported by certain rationales. Id. ¶¶ 421-25.
Although it recognized other approaches were possible, the Commission adopted the “underlying assumption ... that all outlets have‘at least similar technical coverage characteristics.” Id. ¶ 421. While this may be less true for radio stations, the Commission determined that Arbitron Metros truncate the service areas of larger, more powerful stations, equalizing service areas. Additionally, there are generally enough radio stations in a given market so that the per-station share is fairly small. Id.
The Commission found that substituta-bility within media types was much greater than substitutability between media types. Id. ¶ 422. So by breaking up the entire media market based on viewership, and each specific media type based on an equal *470 share theory, the Commission chose a compromise that reflected individuals’ media preferences and the relevant regulatory problem. The Commission provided the following common sense example to support its two complementary approaches:
A radio station owner is able to change format, say from classic rock to all-news, and thus change its impact on the marketplace of ideas. But a radio station switching to all-news does not thereby turn itself into the equivalent of a television station nor does its impact on the marketplace of ideas become that of a television station.

Id.

As the FCC explained: “media outlets can rapidly expand their distribution of content (including local news) at very low marginal cost.” Id. ¶423. The FCC asserts that actual use data within a media type is not as reliable because a media outlet could conceivably increase or decrease its local news content. The majority cites the example of the Home Shopping Network switching to a news format as an example of the improbability of the Commission’s position. That the Home Shopping Network will likely not switch formats does not negate the Commission’s explanation that program shifts can and do occur. Radio stations do switch format.[123] Furthermore, the Commission found local news can be added to television broadcasts at low marginal cost, especially in light of the efficiencies of cross-ownership. Id. Such a programming change could affect market share.
The Commission determined that current programming of a specific media outlet is not necessarily an accurate predictor of future programming. See Maurice E. Stucke and Allen P. Grunes, Antitrust and the Marketplace of Ideas, 69 Antitrust L.J. 249, 277 (2001) (“ ‘[Ejvidence of past production does not, as a matter of logic, necessarily give a proper picture of a company’s future ability to compete.’ Even if one could define markets and assign market shares in the marketplace of ideas, just how reliable would these historic market shares be under dynamic market conditions?”) (quoting United States v. Gen. Dynamics Corp., 415 U.S. 486, 501, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974)). The majority finds this “does not jibe with the Commission’s decision to assign relative weights to the different media types themselves .... ” This statement assumes the Commission must adopt a single strategy for apportioning shares both within and among outlets, and moreover, this strategy must perfectly account for the programming choices of newly acquired radio stations as well as the Home Shopping Network. In my view, the majority imposes an unreasonably high burden.
The Commission noted that adopting a usage measure to determine the most prominent sources for local news and public affairs would require difficult determinations about which content constitutes local news. For example, the Commission posed the question whether movie reviews should be considered. Order ¶ 424. Other gray areas would require similar determinations. Again, the Commission’s goal is not to prescribe what content citizens ac *471 cess, but to ensure that a large range of viewpoints are available to the public. Id. ¶ 425. The equal shares approach adopted by the Commission comports with this goal. As one commentator noted:
In the marketplace of ideas ... what matters is the number of alternative information outlets available to consumers, not the current popularity ... of the ideas communicated by each outlet. Each source of ideas available to a given consumer is equally significant from a First Amendment perspective. The rational way to measure the “share” of each source of ideas available to a given set of consumers, therefore, is to give each source equal weight. It is availability and not usage of alternatives that should count, because it makes no sense to view the FCC’s role as regulating the popularity, as opposed to the availability to consumers, of ideas and information. It is unpopular new ideas that may be of the greatest importance to the future. Such unpopular ideas are the essence of diversity in the marketplace of ideas.
Bruce M. Owen, Regulatory Reform: The Telecommunications Act of 1996 and the FCC Media Ownership Rules, 2003 Mich. St. DCL L. Rev. 671, 692 (2003).
The majority, apparently, would have chosen a different approach. But disagreement with the Commission’s conclusions on such matters does not render those conclusions arbitrary and capricious. The Commission is entitled to “implement its view of the public-interest standard of the Act ‘so long as that view is based on consideration of permissible factors and is otherwise reasonable.’ ” WNCN Listeners’ Guild, 450 U.S. at 594, 101 S.Ct. 1266 (quoting NCCB, 436 U.S. at 793, 98 S.Ct. 2096). In breaking up media types by market share and media outlets equally, in my view, the Commission incorporated public media preferences, its diversity goals, as well as industry characteristics. The Commission’s decision to attribute shares within media equally was reasonable as it took account of permissible factors in light of the FCC’s public interest goals.
3. Deriving the Cross Media Limits from the Diversity Index
The majority contends the Commission did not rationally derive its Cross Media Limits from the Diversity Index results. The majority correctly notes deference to the Commission’s judgment reaches its zenith when assessing the rationality of the agency’s line-drawing endeavors, see NCCB, 436 U.S. at 814-15, 98 S.Ct. 2096, but then takes issue with the “seemingly inconsistent” manner in which the line was drawn.
The majority overlooks the Commission’s statement that the Diversity Index is a tool to help make judgments about cross-ownership, not the final rule. See Order ¶¶ 391, 435. As the Commission emphasized, the “cross-media limits are based on a set of assumptions drawn directly from the record evidence in this proceeding ... [and] ultimately rest[ ] on our independent judgments about the kinds of markets that are most at-risk for viewpoint concentration, and the kinds of transactions that pose the greatest threat to diversity.” Id. ¶ 435 (emphasis added). In looking to the Diversity Index, the Commission did not abdicate its judgment for formula..
The Diversity Index — or the Cross Media Limits for that matter — will not provide the perfect limits in every local market. As the Commission stated:
[W]e are establishing rules of nationwide applicability. We desire, therefore, to provide the industry and the public with clear, easy to administer rales reflective of common market trends and charac *472 teristics. We recognize that, in any given market, the lines we draw here may appear under or over-inclusive. Indeed, that quality inheres in the nature of proscriptive rules themselves.
Id. ¶ 453.
The Commission decided to rely on bright-line rules in crafting its ownership rules. Id. ¶ 80. The FCC chose this approach because “bright line rules provide certainty to outcomes, conserve resources, reduce administrative delays, lower transaction costs, increase transparency of [the] process, and ensure consistency in decisions.” Id. ¶ 82. As a result of the Commission’s decision to adopt a bright-line rule rather than a case-by-case approach, the rules will not always perfectly address the diversity needs of a given market. This characteristic is inherent in nationwide, prescriptive rules, and in my view does not require remand.
The majority finds the Commission allowed combinations (newspaper/television station/50% radio limit) that resulted in higher Diversity Index increases, while disallowing combinations (newspaper/television duopoly), which resulted in lower increases. But the Cross Media Limits were not based solely on the Diversity Index. In fact, the Commission directly addressed the majority’s purported “inconsistency:”
To begin with, the public interest benefits of newspaper ownership (the benefits of cross-fertilization between media) likely are realized primarily in the first broadcast station co-owned in either service. Although there may be economic benefits to the owner from more extensive combinations, it is not clear that these benefits will accrue to the public in any meaningful way; at least the public interest component of these benefits is likely to decline incrementally as the number of stations increases. Given that no owner will be permitted, in accordance with our local ownership cap, to hold more than two television stations in a small to medium size market, a limit of one station in these markets for owners of local newspapers will maximize the public interest benefits, while reducing any loss in diversity. Although the loss of diversity that might result were that owner to add a significant radio presence in the market in the market warrants a further 50% limit in the number of radio properties that owner might hold, such is not the case if a combination does not include any television properties.
Id. ¶ 467 (emphasis added).
A newspaper/television duopoly combination realizes diminishing cross-fertilization benefits in comparison to the combination of a newspaper and the first station in television or radio. Therefore, it was reasonable for the Commission to disallow newspaper/duopoly combinations even when the Diversity Index increase might be lower than that for newspaper/television station/50% radio combinations. It was rational for the Commission to deviate from the Diversity Index in creating its Cross Media Limits. This example highlights that the Cross Media Limits primarily address the impact of cross-ownership on diversity, without ignoring other ownership goals like competition and efficiency.[124]
Furthermore, the first task of the Diversity Index was to identify at-risk markets, then identify at-risk cross-ownership corn- *473 binations. As the Commission commented:
Using our diversity index analysis and our independent judgment regarding desired levels of diversity, we first identify “at-risk” markets that might already be thought to be moderately concentrated for diversity purposes. We then identify the types of transactions that pose the greatest risk to diversity, and impose specific limits on those transactions in at-risk markets.
Id. ¶ 442 (emphasis added). The “horizontal” lines the Commission drew in its Cross Media Limits, i.e., the lines between small and medium markets, and medium and large markets, are supported by the Diversity Index results. See id. App. D. I would not vacate and remand an effective methodology because its results do not correspond to the Commission’s final rule for all combinations in all markets.
The majority focuses on the methodological choices behind the Diversity Index and overlooks the end result — the Cross Media Limits. The Agency recognized the Diversity Index to be “a blunt tool” that is neither “perfect nor absolutely precise.” Id. ¶¶ 392, 398. I see no reason to invalidate any aspect of the Commission’s Index. The Cross Media Limits were the first structural change to the Commission’s N ewspaper/Broadcast Cross-Ownership Rule in nearly thirty years. The Diversity Index lent transparency and empirical footing to this massive undertaking. In my view, it was reasonable for the Agency, both in designing the Diversity Index and in its final Cross Media Limits, to rely on a balanced, empirical approach that will, as a result of § 202(h), be subject to periodic reexamination.
4. Notice
On remand, the majority advises the Commission to cure its “questionable” notice of the Diversity Index. This admonition goes beyond the notice requirements of the Administrative Procedure Act. Under the APA, an agency must publish notice of either the terms or substance of the proposed rule or a description of the subjects and issues involved. 5 U.S.C. § 553(b)(3). The Commission provided notice and opportunity to comment on the newspaper/broadcast cross-ownership rule in two separate notices of proposed rule-making. See Newspaper/Broadcast NPRM, 16 F.C.C.R. 17,283, 2001 WL 1097041 (2001); 2002 Biennial NPRM, 17 F.C.C.R. 18,503, 2002 WL 31108252 (2002). As the majority recognizes, the Commission gave notice that it was considering “creating a new metric” to “reformulate [its] mechanism for measuring diversity and competition in a market,” and that it was contemplating “design[ing] a test that accords different weights to different outlet types.” Notice, 17 F.C.C.R at 18,539-40 ¶¶ 113-115. In the Newspaper/Broadcast NPRM, the Commission discussed at length questions regarding diversity and competition in relation to the Newspaper/Broadcast Cross-Ownership Rule, posing questions for public comment such as: “Is it possible that the effect on diversity will be different depending on the size of the markets involved, or the predominance of newspapers and broadcast stations in a particular local market.” 16 F.C.C.R. at 17,292 ¶ 18. These and other statements in the NPRMs adequately addressed the subject of the new Cross Ownership Rule.
As an analytical tool that informed the Commission’s judgments about how to account for diversity in different markets, and the need for ownership limits in these markets, the Diversity Index itself was formulated as a response to comments. “Rulemaking proceedings would never end if an agency’s response to comments must always be made the subject of additional *474 comments.” Cmty. Nutrition Inst. v. Block, 749 F.2d 50, 58 (D.C.Cir.1984).[125] As the majority notes, formulas derived from comments do not need to be re-noticed unless prejudice will result. Id. (“The response may ... take the form of new scientific studies without entailing the procedural consequences appellants would impose, unless prejudice is shown.”). The Diversity Index provided an empirical foundation for formulating the final rule. The choices made in creating this empirical model were within delegated agency authority and were supported by the record. I do not find the alleged lack of notice to be prejudicial. Every methodological choice will have proponents and detractors, but so long-as the choices are not arbitrary and capricious, they are valid. ' I would not expand the settled notice and comment requirements of § 553.
B. Local Television Ownership Rule
The majority upholds the top-4 limit in the Local Television Ownership Rule but vacates and remands the chosen numerical limits “for the Commission to harmonize certain inconsistencies and better support its assumptions and rationale.”[126]
The FCC justified the- specific numerical caps in its intra-service rules (radio and television) by employing the Department of Justice and Federal Trade Commission’s “standard approach” to evaluating competitive harms of an increase in horizontal market concentration: the Herfindalh-Hirshmann Index (HHI). The DOJ/ FTC Merger Guidelines recognize the HHI level of 1800 as the maximum level for “moderate” concentration. So the FCC designed its local television rule to keep markets within the 1800 limit. Order ¶¶ 192-93. As noted, the FCC selected the upper bound for moderate concentration, 1800, instead of the lower bound, 1000, in recognition of the competitive pressures exerted by the cable networks. Id. ¶ 192.
An HHI score of 1800 corresponds to having six equal-sized competitors in a given market. This led the FCC, in part, to determine in markets of 18 stations or more, an entity could own three stations, while in markets with 5 to 17 stations, an entity could own two stations. Id. ¶ 193. The Commission allowed ownership of two stations in markets with less than 12 stations — though this undercuts its 6 equal-sized competitors goal- — because the economics of local broadcast stations justify slight increases in market concentration as market size decreases. Id. ¶201. The FCC relied on data from the National *475 Association of Broadcasters showing that small-market stations have a harder time competing for revenue than stations in larger markets. Thus, the local television rule represents a “graduated tradeoff between optimal competition in the delivered video market (six station owners) and recognition of the challenging nature of broadcast economics in small to mid-sized markets.” Id. ¶ 202.
In developing the new local ownership tiers, the majority concludes the FCC failed to justify its chosen numerical limits. The majority contends that allowing trio-polies in large markets does not ensure that six equal-sized competitors will emerge because the FCC does not take into account existing respective audience shares among stations in a given market. The majority also finds the FCC cannot cite “fluid” market share as a basis for regulation yet, elsewhere in the same Order, use market share differentials as justification for retaining the top-four restriction. The FCC found, for example, “a general separation between the audience shares of the top four-ranked [local] stations and the audience shares of other stations in the market.” Order ¶ 195.[127] Furthermore, the majority finds the FCC did not cite empirical support for its “equal-sized firm” assumption, and that its assumption of equal market shares, id. ¶ 134, to derive its limits ignores reality. The majority finds that by assuming equal market shares the FCC allowed combinations based on unrealistic market percentages. It maintains the Agency did not rely on market share, but on a rudimentary “head count” of outlets. According to the majority, the inconsistent treatment of market share both within and between rules renders them arbitrary and capricious.[128]
In my view, the Commission justified its decision to assume equal market shares. The majority states the Commission sought to “ensure that markets would not exceed the Merger Guidelines’ 1800 threshold for highly competitive markets.” This statement portrays a heavier reliance on the Merger Guidelines than the Commission avowed. In discussing the relationship between its local television ownership limits and the Merger Guidelines, the Commission said: “a strict, overly simplistic application of the DOJ/FTC Merger Guidelines would potentially prohibit some welfare enhancing mergers and allow some anticompetitive mergers.... ” Order ¶ 193. The Commission also stated:
The DOJ/FTC Merger Guidelines ... are written not for a specific industry, but rather as guidelines intended for application across all industries. Our rulés are formulated for a specific market — the delivery of video programming — and are based on an extensive *476 record on the extent of competition in this market and the effect of our current local TV ownership rule. This record allows us to craft a more finely-tuned rule for this industry.
Id. ¶ 192. So, in fact, the Commission did not seek to “ensure” that no market would exceed the Merger Guidelines’ 1800 threshold for highly competitive markets. Instead the Merger Guidelines provided a “starting point” from which the public interest dictated the final rule. Id.
The majority finds that no evidence supports the Commission’s equal share assumption. I disagree. The FCC found that a station’s market share is too fluid to use as a basis for regulation, so its decision to regulate instead a firm’s “capacity” to deliver programming is justified. Id. ¶ 193. Because product innovation and program choice vary with each season, a firm’s market share is more fluid than in other industries. Thus, the FCC focused on a firm’s capacity to deliver programming. Id. Over the life of a firm’s investment in a station, and the duration of its license, the market breakdown can shift substantially. For example, recently launched broadcast stations now vie with the “big four” for viewers. See id. ¶ 110. As recently as 1995, two new broadcast networks UPN and WB were launched and now both compete-often successfully-for viewers with the “big four” networks. See e.g., http://www.viacom.com/prodbyunitl. tin?ixBusUnit=30 (discussing growing popularity of UPN network) (last visited May 25, 2004); see also Comments of Paxson Communications Corp., at 20 (noting retention of the UHF discount is “likely to encourage the emergence of a larger number of competitive broadcast networks to join the existing seven.”). The Merger Guidelines, which the Commission looked to in setting its local license caps, contemplate the possibility that in instances where current revenue market shares are misleading indicators of competitive performance, equal shares can be imputed to each competitor. DOJ/FTC Merger Guidelines § 1.41 n. 15 (“Where all firms have, on a forward-looking basis, an equal likelihood of securing sales, the Agency will assign firms equal shares.”).
Moreover, the majority discounts the Commission’s assertion that local limits contribute to the Agency’s diversity goals. “Ensuring that several competitors remain within each of the radio and television services, we also ensure that a number of independent outlets for viewpoint will remain in every local market, thereby ensuring that our diversity goal will be promoted.” Order ¶ 129; see also id. ¶ 178. Commentators have recognized that outlets, or sources, should be counted equally in the marketplace of ideas:
I conclude that independently-owned outlets for, or sources of, ideas and information generally should each be counted equally as separate sellers in the marketplace of ideas, with response to the consumers whom they can reach (or the consumers who can reach them), without regard to the classification or popularity of their current content.
Bruce M. Owen, Regulatory Reform, 2003 Mich. St. DCL L. Rev. at 696.
Though not flawless in all markets, the Commission soundly justified its assumption of equal market shares as underpinning for its choice of license limits in its local television rule. In reviewing assumptions made by the Commission in a different context, the D.C. Circuit recently wrote:
These assumptions appear rational on the current record. We have no obvious way of verifying the FCC’s assertion regarding the general characteristics ... We must defer to the Commission’s expert judgment in the absence of rec *477 ord evidence indicating that the Commission’s assumption is a clear error of judgment, or a showing that the empirical assumption is facially implausible or inconsistent.
Am. Family Ass’n, 365 F.3d at 1165-66. In my view, the majority has not shown error approaching this standard. As agency line-drawing deserves deference, and the Commission’s choice of equal market shares is neither arbitrary and capricious, I see no basis for overturning this decision.
C. Local Radio Ownership Rule
The majority supports the Commission’s use of numerical limits in the local radio ownership rule but finds the Commission did not support its decision to retain the existing numerical limits established by § 202(b). The majority also vacates and remands the “five equal-sized firms” starting point, which undergirds the local radio rule, claiming the Commission’s decision is not supported by “substantial evidence.” In light of § 202(h), I agree that the Commission must explain its decision to maintain the existing limits. But I find the Commission to have justified its choices.
First, in reaching its conclusion, the majority employs too high a standard. The Commission’s conclusions do not need to be supported by “substantial evidence.” Rather, the Commission’s line-drawing is generally not overturned “unless a petitioner can demonstrate that the lines drawn ... are patently unreasonable, having no relationship to the underlying regulatory problem.” Sinclair, 284 F.3d at 162 (internal quotations omitted). The Commission’s actions did not “run counter to the evidence before it,” id. (quoting Motor Vehicle, 463 U.S. at 43, 103 S.Ct. 2856), and the Commission “provide[d] a reasoned explanation for its action.” Id.
As discussed, the FCC maintained the radio tiers established by Congress in the 1996 Act. The FCC'explained that retaining the existing tiers would result in five roughly equal-sized firms in each market. Order ¶289. The Commission explained its ownership rules ensure there will be roughly five or six owners in markets with between 27 and 51 radio stations, which should allow competitive market performance. Id.[129] Citing economic literature, the FCC found that five equal-sized firms ensure fragmented, ’ competitive markets. See id. ¶ 289 n. 609. The FCC also concluded the current limits are not overly-restrictive based on data showing the top four stations in each metro market are thriving in terms of revenue and audience share. Id. ¶ 290.
The majority asserts the economic studies on which the FCC relied do not support its premise that a market with five equal-sized competitors is comparable in terms of market performance to a fragmented, structurally competitive market. See id. ¶ 289 n. 609 (citing R. Selter, A Simple Model of Imperfect Competition Where Four Are Few and Six Are Many, 2 Int’l J. Game Theory 141 (1973); Louis Phillips, Competition Policy: A Game Theory Perspective Ch. 2 (Cambridge U. Press 1995); Timothy F. Bresnahan & Peter C. Reiss, Entry and Competition in Concentrated Markets, 99 J. Pol. Econ. 977-1009 (1991)). The majority contends the Commission failed to respond to petitions urging market structures other than equal-sized competitors, which could provide equally competitive markets. From the other direction, the majority picks up the argument of Citizen Petitioners that *478 the game-theory articles should not be followed because they conflict with the most recent rewriting of the Merger Guidelines, which suggest a HHI score above 1800 corresponds with a highly concentrated market. Merger Guidelines § 151(c).
The Commission may favor a certain market structure if it reasonably supports its decision. The Commission is the appropriate body to choose between various equally competitive market structures when formulating its rules. See Am. Family Ass’n, 365 F.3d at 1163 (“Given that both options are rational, the FCC’s choice of means is well within its discretion”). In structuring its rules, the Commission chose to take into account that radio audience shares change over time,[130] and an evaluation of radio market structure must also take into account that licenses provide radio stations with the capacity, and likely the incentive, to provide more popular programming. See Order ¶ 288. It would be irrational if a radio station did not provide more popular programming because it would surpass its allotted market share.
In determining appropriate ownership tiers, the Commission’s use of antitrust theory tailored to the radio industry is reasonable. The Commission is not required to strictly follow the Merger Guidelines in creating its limits. As the majority recognizes, antitrust regulation and FCC ownership regulation play different roles.[131] While the majority may have struck the balance at a different point, the line was the Commission’s to draw. Sinclair, 284 F.3d at 162.
The majority is not convinced by the Commission’s assertion that five equal-sized competitors “would emerge or actually have emerged under numerical limits.” Certainly, “radio station groups with similar numbers of radio stations [can] have vastly different levels of market power.” Order ¶ 290. This assertion, however, does not require the Commission to adopt a market structure that ignores its other finding — that station shares can be fluid. Additionally, as discussed in relation to the Local Television Ownership Rule, an assumption of equal shares makes sense in terms of diversity, as each station has the capability of disseminating information. As the local ownership rules support the Commission’s diversity objectives as well, equal shares are reasonable, and clearly not arbitrary and capricious. See id. ¶ 306 (“Our competition-based limits on local radio ownership thus promote viewpoint diversity, not only ensuring a sufficient number of independent radio voices, but also by preserving a market structure that facilitates and encourages entry in the local media market by new and under-represented parties.”)
The majority finds the Commission “does not explain why it could not take actual market share into account when deriving the numerical limits.” But in its Order, the Commission wrote:
We also reject arguments that we incorporate a market share analysis into the local radio ownership rule or that we continue to “flag” applications that propose radio station combinations above a certain market share.... Market share, however, must be considered in *479 conjunction with the overall structure of the industry in determining whether market power is present. In radio, the availability of a sufficient number of radio channels is of particular importance in ensuring that competition can flourish in local radio markets. The numerical caps and the AM/FM service limits are designed to address that interest, and in our judgment, establishing a inflexible market share limit in our bright-line rule would add little, if any, benefit. We do not seek to discourage radio firms from earning market share through investment in quality programming that listeners prefer; our objective is to prevent firms from gaining market dominance through the consolidation of a significant number of key broadcast facilities. We do not believe that developing a market share limit would significantly advance that objective.
Order ¶ 300 (emphasis added).
The majority also points out the Commission has previously looked to market share for measuring diversity and competition in local radio markets. Again, the Commission expressly addressed its change in policy when it wrote:
We recognize that our conclusion differs from the Commission’s view in 1992 that an audience share cap was necessary “to prevent consolidation of the top stations in a particular local market.” But the audience share cap was never intended to be more than a “backstop” to the new numerical limits the Commission had established, which for the first time allowed a party to own multiple radio stations in a local market. The audience share cap was eliminated as a result of the revisions to the local radio ownership rule that Congress mandated in the 1996 Act, which left only the numerical caps in place. But because of the problems associated with the contour-overlap market definition and counting methodologies, we could not rely with confidence on those numerical limits to protect against undue concentration in local markets. As a result, we began looking at revenue share in our “flagging” process and the interim policy that we established in the Local Radio Ownership NPRM. Now that we have established a rational system for defining radio markets and counting market participants, we believe that the numerical limits will be better able to protect against harmful concentration levels in local radio markets that might otherwise threaten the public interest.
Order ¶ 301. As noted, the Commission based its switch to the Arbitron Metro market definition — which the majority affirms — in part, on the difficulty of guarding against undue consolidation of market share under the old contour-overlap method. See Order ¶ 257 (“[T]he contour-overlap system actually encourages consolidation of powerful radio stations because stations with larger signal contours are more likely to create larger radio markets, which make it more likely that a party would be able to acquire additional radio stations in that market.”). With a more rational market definition, which, according to the Commission, will make consolidation less likely, it was not arbitrary or capricious for the Commission to de-em-phasize market share in crafting its ownership limits.
In order to warrant judicial deference, an agency’s line-drawing decision must be justified by a reasonable explanation and cannot run counter to the evidence. Sinclair, 284 F.3d at 162; see also NCCB, 436 U.S. at 814-15, 98 S.Ct. 2096. No record evidence invalidates the policy choices made by the Commission. Its assumptions and chosen limits correspond to a *480 reasonable market structure for radio programming markets.[132]
The Supreme Court has upheld FCC policy based on factual determinations “that were primarily of judgmental or predictive nature.” NCCB, 436 U.S. at 814, 98 S.Ct. 2096 (noting “complete factual support is not possible or required; ‘a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency’ ”) (quoting FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. at 29, 81 S.Ct. 435). I do not find § 202(h), or any other directive to the Agency, to require the Commission to ignore its well-informed predictions about which types of markets best foster its public interest goals, and consequently to create rules with these markets in mind.
y.
For the foregoing reasons, I would affirm the Commission’s rules.

. See Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) (describing the theoiy of free speech as "an experiment, as all of life is an experiment”).

. FCC v. Nat'l Citizens Comm. for Broad., 436 U.S. 775, 796-97, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ("NCCB’') ("[Diversity] and its effects are ... elusive concepts, not easily defined let alone measured without making qualitative judgments objectionable on both policy and First Amendment grounds.”) (citation omitted).

. FCC v. RCA Communications, Inc., 346 U.S. 86, 96, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) ("the possible benefits of competition do not lend themselves to detailed forecast”).

. See generally Bruce M. Owen, Regulatory Reform: The Telecommunications Act of 1996 and the FCC Media Ownership Rules, 2003 Mich. St. DCL L. Rev. 671 (Fall 2003).

. See, e.g., Rules Governing Standard and High Frequency Broadcast Stations, 5 Fed. Reg. 2382, 2384 (June 26, 1940) (FM radio); Rules Governing Standard and High Frequency Broadcast Stations, 6 Fed. Reg. 2282, 2284-85 (May 6, 1941) (television); Amendment of Sections 73.35, 73.240, and 73.636 of the Commission’s Rules Relating to Multiple Ownership of Standard, FM and Television Broadcast Stations, 22 F.C.C.2d 306, 307-08 ¶¶ 5-8, 1970 WL 18044 (1970) (proscribing common ownership of more than one full-time broadcast station (radio or TV)); Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard FM, and Television Broadcast Stations, 50 F.C.C.2d 1046, 1975 WL 30457 (1975), amended on reconsideration, 53 F.C.C.2d 589 (1975) (prohibiting broadcast licensees from owning or controlling newspapers in the same geographic markets).

. In the Consolidated Appropriations Act of 2004, Pub.L. 108-199, § 629, 118 Stat. 3, 100 (2004), Congress replaced the biennial review with a quadrennial review.

. See H.R. Conf. Rep. No. 104-458, at 113 (1996) (defining purpose of the Act "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies to all Americans by opening all telecommunications markets to competition”).

. See Michael I. Meyerson, Ideas of the Marketplace: A Guide to the 1996 Telecommunications Act, 49 Fed. Comm. L.J. 251, 253 (1997) ("The 1996 Act is an experiment, as, one would have to admit, all telecommunication regulation is an experiment.”).

. The Notice of Proposed Rulemaking process ("NPRM”) typically consumes several months. See, e.g., Rules and Policies Concerning Multiple Ownership of Radio Broadcast Stations in Local Markets, Definition of Radio Markets, 16 F.C.C.R. 19,861, 2001 WL 1402453 (2001) (allowing 90-days from publication of notice for comment and reply); Cross-Ownership of Broadcast Stations and Newspapers, Newspaper/Radio Cross-Ownership Waiver Policy, Order and Notice of Proposed Rule Making, 16 F.C.C.R. 17,283, 2001 WL 1097041 (2001) (issuing notice of proposed rulemaking on September 20, 2001, and requiring comment and reply by January 7, 2002). Thereafter, the Commission requires additional time to thoroughly review and evaluate the public commentary gathered through the NPRM. Here, the Commission initiated a comprehensive NPRM on the proposed media ownership rules-which incorporated commentary from previous rulemaking proceedings on the local radio and newspaper/broadcast cross-ownership rules-on September 23, 2002. See 2002 Biennial Regulatory Review — Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; Cross-Ownership of Broadcast Stations and Newspapers; Rules and Policies Concerning Multiple Ownership of Radio Broadcast Stations in Local Markets; Definition of Radio Markets ("Notice”), 17 F.C.C.R. 18,503, 2002 WL 31108252 (2002). The Commission did not issue its final order on the proposed media ownership rules until July 2, 2003, some ten months after initiation of the notice and comment process.

.The Commission has already been chastised for holding up the process of deregulation so clearly mandated by Congress. See Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1042 (D.C.Cir.2002) ("Fox I") ("The Commission’s wait-and-see approach cannot be squared with its statutory mandate *439 promptly ... to 'repeal or modify’ any rule that is not ‘necessary in the public interest.’ ”).

. The D.C. Circuit's amendment of Fox I in Fox Television Stations v. FCC, 293 F.3d 537 (D.C.Cir.2002) ("Fox II"), does not negate the deregulatoiy flavor of § 202(h).
In Fox I, the D.C. Circuit declared that section 202(h) "is clear that a regulation should be retained only insofar as it is necessary in, not merely consonant with, the public interest.” 280 F.3d at 1050. This language was subsequently modified upon petition by the FCC. Fox II, 293 F.3d 537. The FCC’s petition was denied with regard to interpretation of the word "necessary,” however. Id. at 540. Instead, the court held that its earlier decision "did not turn at all upon interpreting 'necessary in the public interest' to mean more than 'in the public interest.’ ” Id. Nonetheless, the court noted that, because the issue was not fully briefed, the meaning of "necessary in the public interest” should be left open. Id. The paragraph interpreting "necessary in the public interest” in Fox I, 280 F.3d at 1050, was rewritten to read:
Next, Time Warner argues that the Commission applied too lenient a standard when it concluded only that the CBCO Rule "continues to serve the public interest,” ... and not that it was "necessary” in the public interest. Again the Commission is silent, but nonetheless we do not reach the merits of Time Warner's argument. This important question was barely raised by the petitioners and was not addressed at all by the Commission or the intervenors. Even if "necessary in the public interest” means simply, "continues to serve the public interest,” for all the reasons given above and below, the Commission’s decision not to repeal or to modify the NTSO and the CBCO Rules cannot stand.
293 F.3d at 541. This language, leaving open the meaning of "necessary in the public interest,” does not alter the effect of § 202(h) on our standard of review.

. The majority found the Commission’s interpretation of § 202(h) misguided. I believe the Commission adequately articulated the standard in its Order. I do not find the Commission's statements about its burden under § 202(h) to significantly alter the standard of review expressed in this section.

. Courts have recognized that Chevron standards apply to judicial review of the Commission's interpretation of the Communications Act. See Cellco, 357 F.3d at 94. Under the familiar instruction of Chevron, an agency's construction of the statute it administers will be upheld unless it contradicts an explicit congressional directive or otherwise is an impermissible interpretation of the statute. Chevron, 467 U.S. at 844, 104 S.Ct. 2778. The Commission’s interpretation is clearly permissible. Nonetheless, even without Chevron deference, the FCC properly interpreted the statute.

. Célico restricted any discussion in Fox and Sinclair of a presumption to repeal or modify rules under § 202(h) to those cases' discussions of remedies. See Cellco, 357 F.3d at 98. I do not believe the deregulatory thrust of § 202(h) can be so easily eviscerated.

.''Necessary” has been found to mean more than merely "useful” or "appropriate” by other courts reviewing the 1996 Act, but these cases all dealt with other discrete portions of the statute. See Cellular Telecomm. & Internet Ass’n v. FCC, 330 F.3d 502 (D.C.Cir.2003) (dealing with § 10(a) of the 1934 Act); GTE Serv. Corp. v. FCC, 205 F.3d 416 (D.C.Cir.2000) (dealing with 47 U.S.C. § 251); AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (same). Moreover, the Cellular Telecommunications court explicitly rejected the "indispensable” interpretation of "necessary” as required by the statute, instead giving Chevron deference to the FCC’s interpretation that "necessary” in § 10(a) means "referring to the existence of a strong connection between what the agency has done by way of regulation and what the agency permissibly sought to achieve.” Cellular Telecomm., 330 F.3d at 509-12 (discussing GTE, 205 F.3d 416; Iowa Util. Bd., 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835). Most recently in Cellco, 357 F.3d 88, the D.C. Circuit upheld the Agency's “useful” interpretation of "necessary” in a similar review provision of the 1996 Act. Id. at 99.

. On this point, I do not find the 1996 Act provided a highwater mark for regulation, beyond which the FCC could not regulate.

. As noted in the denial of the motion to transfer, "we find this case separable and independent from Fox and Sinclair....” Denial of Motion to Transfer, at 5.

. The majority also vacates and remands the Commission's decision to repeal the Failed Station Solicitation Rule, as well as its decision to retain an AM sub-cap in the Local Radio Ownership Rule. Finally, the majority instructs the Commission to provide specific notice of the Diversity Index in its rulemaking after remand. I find none of these purported flaws to be arbitrary or capricious or violate § 202(h).

. As the majority noted, our review of this rule is precluded by the Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99 (2004). For reasons discussed in the majority opinion, I agree this statutory directive renders challenges to the Commission's decision to maintain the UHF discount moot. I also agree the Commission is not estopped from revisiting the UHF discount in rulemaking outside the § 202(h) context.

. Still, the Commission reiterated its commitment to review particular cases and to closely examine both waiver requests and petitions to deny. Order ¶ 85.

. As the Commission noted, the headlines that appear on Google News are selected entirely by computer algorithms, based on how and where the stories appear elsewhere on the web. There are no human editors at Google selecting the headlines and deciding which headlines get top placement. Order ¶ 119 n. 230 (citing A Novel Approach to News, Google News (BETA), at www.goo-gle.com/help/aboutjnews_search.html).

. As noted, the Commission adopted a different policy with regard to the Internet where many more “stations,” or websites, exist. ■

. Average Diversity Indices for these markets ranged from 753-928. See Order App. D.

. This aspect of the Rule will be referred to as the top-four rule.

. The contour-overlap methodology is discussed in detail infra pp. 459-60.

. The Commission recognized, "Arbitron Metros do not cover the entire country.” Order ¶ 282. There are 287 Arbitron Metros, which cover 60% of the commercial radio stations, 30% of the counties, and 78% of the population above age 12 in the United States, including Puerto Rico. Id. Accordingly, the Commission initiated a new rulemaking proceeding to “develop radio market definitions for non-Metro areas.” Id. ¶283. The use of one kind of radio definition in some markets and a different kind of definition in others does not render the rule irrational.

. "Metro” is Arbitron's term for a geographic radio market, consisting of a particular county or set of counties with a boundary defined by Arbitron. See Order ¶¶ 275, 277 & n. 582.

. The FCC defined "eligible entities” as companies with six million dollars or less in annual revenue. Order ¶ 489. Only such entities may acquire non-compliant combinations. Eligible entities may not transfer a grandfathered combination acquired after the adoption date of this Order to a non-eligible entity unless the transferor entity held the combination for a minimum of three years. Id. ¶ 490.

. A typical radio Joint Sales Agreement authorizes the broker to sell advertising time for the brokered station in return for a fee paid to *463 the licensee. The broker is generally given the authority to "hire a sales force for the brokered station, set advertising prices, and make other decisions regarding the sale of advertising time.” Order ¶ 316.

. The FCC previously attributed Local Marketing Agreements (LMAs) in both radio and television. Revision of Radio Rules and Policies, 7 F.C.C.R. 2755, 2788-89; Review of the Commission’s Regulations Governing Attribution of Broadcast and Cable/MDS Interests, 14 F.C.C.R. 12,559, 12,612, 1999 WL 591826 (1999).

. I note at the outset the Commission created the Diversity Index with the intention to "understat[e] the true level of viewpoint diversity.” Order ¶ 400. This makes the majority's conclusion even less persuasive.

. The majority discusses a follow-up question where respondents who used the Internet as a news source were asked which sites they had used in the past seven days as a source of local or national news. The most predominant response was "other” (34.9%). If anything, this response demonstrates that varied, independent sources exist on the Internet.

. Salon.com (www.salon.com) is an online subscription magazine with independently produced content, though much of this content does not qualify as "local” news.

. The Drudge Report (www.drudgere-port.com) is an online collection of news that is not independently produced, though the news is independently prioritized and displayed.

. The majority criticizes the Commission for citing two websites that do not specialize in independent local news-www.salon.com and www.drudgereport.com. These sites were noted as compilations of news unique to the Internet. The Commission is not required to provide examples of independent local websites in the Order. The record fills this gap.

. Some websites referenced in the comments are online platforms for newspapers or broadcast stations. The existence of such sites does not discredit the existence of numerous independent websites cited in the record however.

. To cite one of a multitude of examples, the website for the City of Philadelphia, www.phila.gov., has a specific section for Philadelphia news. See www.phi-la.gov/news. This section of the website posts many news releases of interest to Philadelphia residents and others. The website also contains a link to mayoral initiatives. http://www.phila.gov/mayor/initiatives/in-dex.html. These services are substantially different from those provided by comics and classified advertisements. See Order ¶ 424 (explaining the Commission would not count the comics or classifieds of a newspaper toward viewpoint diversity because "it is not clear that the service has anything to do with news and current affairs.”). The website also contains a link to the Philadelphia City Council homepage, which contains member bios, committee information as well as council agendas. See www.phila.gov/city-council/index,html.

. The 'following list provides some of the websites cited in the record: www.al-banycounty.com, www.sfgov.org, www.sa-nantonio.gov, www.cityofseattle.net, www.phila.gov,www.acps.kl2.va.us, and www.cityofglensfalls.com. These are local government and chamber of commerce websites that include information such as government meeting minutes, city budget reports, local community news, local human interest stories, and calendars of events.

. A recent study indicates that the number of Americans with Internet access has topped 200 million, or nearly three-fourths of the population older than two. See U.S. Online Population Tops 200 Million: , Survey, available at www.communicate.com/news_dis-play .php?newsID=54.

. The Commission only deviated from this approach with the Internet. See Order ¶ 426.

. The record shows that the number of radio transfers since the 1996 Act is unprecedented. Radio Indus. Review 2002: Trends in Ownership, Format and Finance. Clearly, to the extent these transfers include programming choices, market share could be fluid. One example of a programming shift likely to affect viewer-ship in many markets is the emergence of liberal talk radio. See Thom Hartmann, Move Over, Right Wing Radio — the Liberals are Coming, http://www.common-dreams.org/views03/0519-03.htm (last visited May 25, 2004.).

. The majority also criticizes the Commission's decision to allow newspaper + 1 TV station + 50% radio station combinations in light of their HHI increases. But this decision is a matter within the sound discretion of the Commission's line-drawing authority.

. As noted, the complexity of the Commission's rulemaking requires a lengthy rule-making cycle. See supra p. 438 n. 91. The majority's suggestion that the Diversity Index required an additional round of notice and comment would unnecessarily extend, and delay,- the Commission’s § 202(h) review process.

. The majority also vacates and remands the Commission's repeal of the Failed Station Solicitation Rule, 47 C.F.R. § 73.3555 n. 7. In my view, the Commission adequately ■ supported its decision to repeal this rule noting, "the efficiencies associated with operation of the two same-market stations, absent unusual circumstances, will always result in the buyer being the owner of another station in that market." Order ¶ 225. The Commission’s explanation took account of the public interest, because a "failed, failing, or unbuilt station” cannot contribute to localism, competition, or diversity. Id. The Commission reasonably determined that repealing the solicitation rule in such circumstances would serve the public interest by preventing the licensee’s assets from "exiting] the market.” Id. The Commission concluded "the public interest benefits of activating a dark or unbuilt station, outweigh[ ] the potential harm to competition or diversity.” Id. The Commission's explanation for the repeal of the FSSR demonstrates that its decision was not arbitrary and capricious, and was in the public interest.

. The Commission instituted its top-four restriction in part due to the generally high market shares of the top-four stations in many markets. But this was not the sole justification for the rule. The Commission determined, "combinations involving the top four-ranked stations are less likely to yield public interest benefits such as new or expanded , local news programming,” since “such stations are already originating local news.” Order ¶ 198. The "[flop four-ranked stations also are more likely to have made the transition to DTV [digital television] than other stations.” Id. ¶ 199.

. The majority cites the example of Philadelphia, where the duopoly owner Viacom could acquire a third station and potentially increase its audience share from 25% to 34%. According to the majority, such a merger would raise Philadelphia’s HHI score to 2487. But this assumes there would be no competitive buyers for the television station. It also fails to account for the antitrust review of proposed mergers by the Department of Justice. Finally, the proposed combination would still face competition from 12 commercial and 5 noncommercial television stations, as well as a host of additional media.

. Similar to the local television rule, the Commission acknowledged the limits allow for more consolidation in smaller markets where the viability of stations may require greater levels of concentration. Order ¶¶ 292-93.

. See supra p. 470 & n. 123 (discussing the increase of license transfers in the radio in- ' dustry).

. The Commission need not rely identically on the Merger Guidelines in its television and radio rules. The majority recognizes the rules need not mirror each other, but then criticizes the Commission for not following the Merger Guidelines to the same extent in both rules. As the majority notes, radio markets may be different, in part, due to the greater number of available stations in most markets.

. The majority also finds the Commission failed to justify its retention of an AM subcap. Order ¶ 294. I believe the Commission adequately supported the sub-caps. The Commission explained that AM and FM stations have different technological characteristics as well as different programming formats (AM stations often have news/tallc/sports or ethnic formats). Id. The Commission originally adopted specific AM and FM ownership limits in order to "prevent one entity from putting together a powerful combination of stations in a single service that may enjoy an advantage over stations in a different service.” Revision of Radio Rules and Policies, 7 F.C.C.R. 2755, 2778 ¶ 44. The same rationale survives today. A limit on AM station ownership will continue to create more robust competition within that frequency. Because, as the Commission explained, the AM frequency is its own sub-market, ensuring competition in this frequency is consistent with the public interest.